1          UNITED STATES DISTRICT COURT

2           SOUTHERN DISTRICT OF OHIO

3               WESTERN DIVISION

4    _____

5    ROGER PAUL LANKFORD,   :

6          Plaintiff      :

7     -vs-                 : CASE NO. 1:14-CV-682

8    RELADYNE, LLC, ET AL, :

9          Defendants     :

10   _____

11

12          Deposition of CHARLES ANTHONY DOWNS, a

13   witness herein, taken by the Defendants as upon cross

14   examination and pursuant to the Federal Rules of

15   Civil Procedure as to the time and place and

16   stipulations hereinafter set forth, at the offices of

17   Britton & Associates, 201 Riverside Drive, Suite 2-B,

18   Dayton, Ohio at 11:44 a.m. on June 30th, 2015, before

19   Lainey Fergueson, a CSR, and Notary Public within and

20   for the State of Ohio.

21

22

23          *    *    *    *    *    *

24

25

```
 1                    QUICK REFERENCE INDEX

 2       WITNESS:  CHARLES ANTHONY DOWNS

 3       APPEARANCES:   PAGE 3

 4

 5                         DX   CX   RDX   RCX

 6       BY:  MR. MANSELL    -    4    -     -

 7

 8                         EXHIBITS

 9            IDENTIFIED                    PAGE

10       PLF'S:        7                     7

11       PLF'S:        8                     9

12       PLF'S:        9                    11

13       PLF'S:       10                    14

14       PLF'S:       11                    26

15       PLF'S:       12                    30

16       PLF'S:       13                    31

17       PLF'S:       14                    36

18

19                 INFORMATION REQUESTED

20                   NOT APPLICABLE

21

22               *    *    *    *    *

23

24

25
```

1    <u>APPEARANCES</u>

2    ON BEHALF OF PLAINTIFF

3        Mr. Gregory Mansell
         Attorney at Law
4        Mansell Law, LLC
         1457 South High Street
5        Columbus, Ohio 43207

6
         Mr. Peter Friedmann
7        Attorney at Law
         The Friedmann Firm
8        1457 South High Street
         Columbus, Ohio 43207
9

10
     ON BEHALF OF DEFENDANTS
11
         Mr. Gary Winters
12       Attorney at Law
         McCaslin, Imbus & McCaslin
13       632 Vine Street
         Suite 900
14       Cincinnati, Ohio 45202

15

16                    *    *    *    *    *

17

18

19

20

21

22

23

24

25

1    WHEREUPON:

2                   CHARLES ANTHONY DOWNS,

3    of lawful age, a witness herein, being first duly

4    sworn as hereinafter certified, testified as

5    follows:

6                   CROSS-EXAMINATION

7    BY MR. MANSELL:

8         Q.   All right.  Mr. Downs, will you please

9    state your name for the record?

10        A.   Charles Anthony Downs.

11        Q.   And do you go by Tony?

12        A.   Correct.

13        Q.   And, Mr. Downs, I'm an attorney that

14   represents Paul Lankford in this matter, and you've

15   already been deposed one time, but just as a

16   reminder, she's taking everything down and we need

17   to help her out by not talking over each other and

18   giving verbal answers.  Is that fair?

19        A.   That's fair.

20        Q.   The same rule applies that if you need

21   a break, let me know and we'll be happy to get you

22   one as long as you answer any question that is

23   pending.  Is that fair?

24        A.   That's fair.

25        Q.   Any reason that you would not be able

1    to recall facts truthfully or accurately today?

2         A.   No.

3         Q.   All right.  Mr. Downs, tell me when you

4    first became aware of, how you first became aware

5    that Mr. Lankford was going to be taking a leave of

6    absence?

7         A.   He called me one afternoon and said he

8    had to check himself into rehab in Florida and he

9    would be gone, approximately, 35 days, and I told

10   him to take all the time he needed.  We were here

11   to support him, and it was a short conversation.

12        Q.   Did you talk about paperwork or

13   anything of that nature?

14        A.   I did not.

15        Q.   Did you inform anybody in human

16   resources about Mr. Lankford's need to take a leave

17   of absence for rehab?

18        A.   The best I can recall was we have two

19   people in my office who handled HR at that time and

20   I informed them.

21        Q.   And who was that?

22        A.   Chris Chaille and Ann Boeckermann.

23        Q.   And you informed both of them?

24        A.   Correct.

25        Q.   And did they tell you to do anything

1     else at that point?

2          A.   No.

3          Q.   Were you, did you play any part in the

4     paperwork that Mr. Lankford was to fill out or --

5          A.   No.

6          Q.   And did you have any more conversations

7     with Mr. Lankford prior to him going to inpatient

8     care?

9          A.   What do you mean prior conversation?

10    About him going into rehab?

11         Q.   Yes.  Before he actually went into

12    rehab.

13         A.   No, that was the first.

14         Q.   You just had that one conversation and

15    then he went, as far as you know, he went off to

16    rehab?

17         A.   Correct.

18         Q.   All right.  Did you have any role or

19    responsibility informing his customers that he was

20    going to be taking a leave of absence?

21         A.   No.  We did not inform any customers,

22    to the best of my knowledge.

23         Q.   Was anybody going to be covering his

24    accounts?

25         A.   We had some inside salespeople.  Every

1          outside guy has an inside person, and they were

2          going to handle it.

3                  Q.   So if a customer wants to get ahold of

4          an outside guy and he's sitting down meeting with

5          another customer, will the call get forwarded to

6          the inside sales --

7                  A.   No, not forwarded.  But most of the

8          customers knew who their inside contact was.

9                  Q.   So if they couldn't get ahold of the

10         outside guy and they need something quickly, they

11         could go to the inside guy?

12                 A.   Correct.

13                 Q.   Did you have any conversations with

14         Walt Rodgers about Mr. Lankford's need to take a

15         leave of absence prior to Mr. Lankford actually

16         going into rehab?

17                 A.   No.

18                          (WHEREUPON, Plaintiff's Exhibit 7

19         was marked for identification.)

20         BY MR. MANSELL:

21                 Q.   All right.  I'm handing you what's been

22         marked as Plaintiff's Exhibit 7.  Have you seen

23         this e-mail thread before?

24                 A.   No.

25                 Q.   All right.  Is the bottom e-mail, and

1    e-mails go in reverse chronological order how they

2    print out.  The bottom of the e-mail here is from

3    Bob Johnson to yourself and Dan Oehler dated

4    February 3rd, 2014.

5                     Do you see that?

6              A.   Uh-huh.

7              Q.   Yes?

8              A.   Yes.

9              Q.   And do you have any reason to doubt

10   that you didn't get that e-mail?

11             A.   No.  I get 200-and-some a day so

12   there's no way I'm going to remember e-mails.

13             Q.   Sure.  And so, the top e-mail is a

14   response from you back to Bob Johnson and Dan

15   Oehler shortly after the first e-mail; is that

16   accurate?

17             A.   Uh-huh, yes.

18             Q.   And who is Bob Johnson?

19             A.   He is a national sales manager.

20             Q.   And at the time in February 2014 is

21   that the position he held?

22             A.   Yes.  And at one time, I do not know

23   the dates, he was, he acted as our sales manager

24   when we did not have one for Cincinnati.  He's over

25   the entire RelaDyne corporation.

1          Q.   And you're telling Bob Johnson and Dan
2     Oehler that Mr. Lankford has told some he is out on
3     medical leave?
4          A.   That's what it states, correct.
5          Q.   Do you remember having a conversation
6     with Dan Oehler on February 3rd about medical leave
7     related to Paul?
8          A.   No.
9                    (WHEREUPON, Plaintiff's Exhibit 8
10    was marked for identification.)
11    BY MR. MANSELL:
12         Q.   I'm handing you what's been marked as
13    Plaintiff's Exhibit 8.  What did we call the first
14    one?
15         A.   Seven.
16         Q.   All right.  Have you had a chance to
17    review this document?
18         A.   Almost.
19         Q.   Okay.  Let me know when you're ready.
20         A.   (Witness reviews document.)  Okay.
21         Q.   All right.  The bottom, the first
22    e-mail, which is on the bottom of the page on
23    Plaintiff's Exhibit 7, and then the top e-mail is
24    another response from you but now a little over a
25    day later on February 4th, 2014.

1                    Do you see that?

2               A.   Yes.

3               Q.   All right.  And you say, FYI, Paul L.

4    checked himself into rehab last Thursday in Florida

5    for 35 days due to drinking.  Do you know what

6    prompted you to send this e-mail a day later?

7               A.   What prompted me?

8               Q.   Yes.  You originally responded that

9    Paul has been telling some people he's out on

10   medical leave, and then a day later you go into

11   some detail for Dan and you actually take off

12   Mr. Johnson and add Doug Oehler on it.  I just want

13   to know if you recall any specific reason as to

14   why --

15              A.   Just informing them.

16              Q.   Okay.  And why are you informing them?

17   Who are Dan and Doug Oehler?

18              A.   Doug is my direct boss.  He's regional

19   VP, and Dan is VP of sales.

20              Q.   Was Doug your direct boss at the time?

21              A.   Yes.

22              Q.   And was Dan Oehler also in your chain

23   of command?

24              A.   My chain of command, he's a VP so he is

25   in the chain of command when it comes to sales.

1                    (WHEREUPON, Plaintiff's Exhibit 9

2        was marked for identification.)

3        BY MR. MANSELL:

4              Q.  All right.  I'm handing you what's been

5        marked as Plaintiff's Exhibit 9.  Tell me when

6        you're ready.

7              A.  Okay.

8              Q.  And you would agree that Plaintiff's

9        Exhibit 9 has the same two e-mails at the bottom as

10       Exhibit 8, but now has a response from Dan Oehler

11       at the top, approximately, five minutes after you

12       sent your e-mail?

13             A.  Correct.

14             Q.  And he copies Walt Rodgers on it, as

15       well.  Do you see that?

16             A.  Correct.

17             Q.  Who is Walt Rodgers at this time?

18             A.  VP of HR.

19             Q.  All right.  And Dan Oehler says, Tony,

20       you did not tell me.  I found out yesterday from

21       Bob Johnson.  I'm in Houston, and we will need to

22       discuss this.  We have too many signs to ignore and

23       not proactively address.

24                    Do you recall having a discussion

25       with Mr. Oehler shortly after this e-mail?

1          A.   No.

2          Q.   Okay.  Is it possible that you had a

3     conversation and you just don't remember?

4               MR. WINTERS:  Objection.  I've

5     asked him not to speculate on possibilities.  He

6     can tell you what he remembers.

7               MR. MANSELL:  Okay.

8     BY MR. MANSELL:

9          Q.   You can answer that question.  Are you

10    telling me you do not remember or are you saying

11    that conversation did not occur?

12         A.   I do not remember.

13         Q.   What was your understanding of

14    Mr. Oehler's last sentence, we have too many signs

15    to ignore and not proactively address?  What was

16    your understanding of what that meant?

17         A.   It did not mean anything to me.  I just

18    read it and went on.

19         Q.   I'm handing you what's been previously

20    marked as Plaintiff's Exhibit 3.  It's the same

21    e-mail chain we've been discussing, but now you

22    have forwarded the e-mail chain to David Luke and

23    Tim Mastropaolo about six minutes later.

24               Do you see that?

25         A.   Yes.

1          Q.   And do you recall why you would forward
2     this e-mail chain to David Luke?
3          A.   Yes.  Because he was in charge of the
4     investigation with Paul.
5          Q.   What investigation with Paul?
6          A.   When we first found out there was a
7     problem with missing product.
8          Q.   And why would you send this to Tim
9     Mastropaolo?
10         A.   He is my operations manager who also
11    gets a lot of calls from customers.  He's part of
12    the management team so I forwarded it to him to let
13    him know what was going on.
14         Q.   What in this e-mail chain did you feel
15    was necessary information for David Luke to have?
16         A.   All of it.
17         Q.   Okay.  So the fact that Paul checked
18    himself into rehab last Thursday in Florida for 35
19    days due to drinking was information you wanted
20    David Luke to have?
21         A.   If it was in the e-mail, I wanted him
22    to have it.
23         Q.   Can you explain to me how that's
24    relevant to any investigation?
25         A.   You would have to ask him.

1          Q.   Oh, did he ask you to give him any

2     information about Paul Lankford?

3          A.   No.  He was conducting an investigation

4     so I thought it was best he knew of any e-mails or

5     any information.

6          Q.   What do you recall, or how do you

7     recall first being notified that there was an issue

8     regarding Paul Lankford that warranted an

9     investigation?

10          A.   To the best of my knowledge, David Luke

11     and Tim Mastropaolo approached me that there was

12     some issues.  Didn't go into it at great detail,

13     but it was given the okay for David Luke to pursue

14     the investigation by, I don't know.  I didn't

15     approve it per se, but between me, Tim, and David,

16     we said we had to pursue the investigation.

17                    (WHEREUPON, Plaintiff's Exhibit 10

18     was marked for identification.)

19     BY MR. MANSELL:

20          Q.   Okay.  I'm handing you what's been

21     marked as Plaintiff's Exhibit 10.  All right.  Have

22     you seen this or do you agree that this is an

23     e-mail chain that you are either copied on or

24     sending?

25          A.   Correct.

1          Q.   And the second page is titled,

2     investigation into misappropriation of product?

3          A.   Correct.

4          Q.   I want to turn to that second page.

5          A.   Uh-huh.

6          Q.   I want you to drop down to about the

7     middle of the page where the paragraph, it says,

8     upon.  Do you see that?

9          A.   Yes.

10          Q.   Do you recall Bruce Gee making a

11     complaint, or did Bruce Gee make a complaint to

12     you?

13          A.   He never approached me.  It was

14     between, I don't know if he approached David Luke

15     or Tim or both.  I have no idea who he approached

16     first.

17          Q.   When did you first become aware that

18     Bruce Gee had approached anyone?

19          A.   When Tim and David Luke told me the

20     first about it.

21          Q.   The second, the next paragraph down, it

22     states that Tim contacted David Luke to look into

23     the matter on January 14th, 2014.  Do you believe

24     that's when you found out is, approximately,

25     mid-January?

1              A.   To the best of my knowledge, yes.

2              Q.   Did you have any input at that time?

3              A.   No.

4              Q.   Now, were you aware of a promotion that

5     Mr. Lankford had with the Covington Auto Body?

6              A.   What I was aware of, Paul came to me

7     and wanted to do a donation, and that's all I

8     recall of that and the auto body.

9              Q.   Did you approve it?

10             A.   Correct.

11             Q.   Do you recall when that, approximately,

12    was?

13             A.   No, I do not.

14             Q.   All right.  And so, I wanted you to go

15    back to the first page now.  It's an e-mail, the

16    bottom e-mail is from David Luke to yourself and

17    Tim Mastropaolo dated January 7, 2014, and it

18    states, here is a written report on the allegations

19    against Paul Lankford.

20                  Do you see that?

21             A.   Yes.

22             Q.   Is this the first time the report was

23    sent to you January 27, 2014?

24             A.   To the best of my knowledge, yes.

25             Q.   Okay.  And what did you do with the

1     report when you got it?

2            A.   I read it and then I forwarded it to

3     Ann, who was also helping in HR and payroll, and

4     she's also our controller.  Tim was responsible at

5     that time for doing outside sales commission and

6     was in charge of doing the entire payroll for our

7     staff.  And she does accounting and then she had,

8     she was responsible, she had the personnel files,

9     as well, access to the personnel files along with

10    Chris.

11           Q.   So you don't send it right away, you

12    receive it on a Monday and you don't send it to Ann

13    Boeckermann until Tuesday of the following week.

14    Do you see that?

15           A.   Yes.

16           Q.   Why did you wait so long?  Any reason

17    you can recall?

18           A.   I could have been out of town.  I could

19    have been with, I have no idea where I was or why I

20    waited.

21           Q.   All right.  And why would Ann

22    Boeckermann, why would she need this document?

23           A.   She's part of the management team and

24    HR so I felt she needed to be in the loop.

25           Q.   All right.  Did you forward this

1      particular document to anybody else?

2             A.   To the best of my knowledge, no.

3             Q.   After you received this e-mail with the

4      report, the one-page report from David Luke on

5      January 27th, did you have any conversations

6      between January 27th and February 4th with Mr. Luke

7      or Mr. Mastropaolo related to the report?

8             A.   I do not remember.

9             Q.   Was it your understanding that Mrs.

10     Boeckermann would, well, what was your

11     understanding what Ms. Boeckermann would do with

12     the report?

13            A.   I had no plans of doing anything other

14     than just to inform her of what was going on.

15            Q.   Do you believe that you were aware of

16     the allegations against Mr. Lankford prior to him

17     going on leave?

18            A.   No.  I did not know anything about the

19     allegations.

20            Q.   If you look on the second page of

21     Exhibit 10, that third paragraph up from the

22     bottom, it starts with, upon hearing this

23     allegation --

24            A.   Uh-huh.

25            Q.   -- the last sentence says, once Tim had

1    this information, he contacted me to look into this

2    matter on January 14th, 2014.  Do you see that?

3            A.  Yes.

4            Q.  And Mr. Lankford didn't call you until

5    the end of January to go on medical leave, correct?

6            A.  Correct.

7            Q.  So you believe that you weren't

8    informed of the allegations prior to looking at

9    that January 14th date and knowing that Mr.

10   Lankford didn't go on leave until the end of the

11   month?  Do you believe you didn't know of the

12   allegations prior to Mr. Lankford going on leave?

13           A.  With the dates, I cannot recall.

14           Q.  But you didn't have a conversation with

15   Mr. Lankford about the allegations prior to him

16   going on leave, did you?

17           A.  No.

18           Q.  Do you think it was appropriate to have

19   a conversation with Mr. Lankford to determine what

20   his side of the story was?

21               MR. WINTERS:  Are you asking him

22   if he should have had a conversation with him?

23               MR. MANSELL:  Yeah.

24               MR. WINTERS:  Well, no, because I

25   think he's told you he wasn't sure when he learned

1    about it, and then he also told you he didn't --

2                    MR. MANSELL:  Gary, no more

3    speaking objections.  You're speaking on the

4    record.  If you have an objection --

5                    MR. WINTERS:  I am making my

6    objection.

7                    MR. MANSELL:  Then say objection.

8    If you keep speaking, we're going to stop the

9    deposition.

10                   MR. WINTERS:  Whatever you want,

11   but I have made my objection.  He may answer your

12   question.  I haven't --

13                   MR. MANSELL:  Will you repeat the

14   question?

15                   (WHEREUPON, the reporter read back

16   the requested portion of testimony.)

17                   THE WITNESS:  To the best of my

18   knowledge with not having the dates when he called,

19   it did not even enter my mind.  So, like I said, I

20   don't know exactly when him and David Luke informed

21   me so I cannot answer that question.

22   BY MR. MANSELL:

23        Q.  Were you part of the investigation?

24        A.  No.

25        Q.  Were you part of the decision process

1       of terminating Mr. Lankford?

2               A.   No.   I did not fight it when I got the

3       word from Walt saying per the ethical violation on

4       the handbook.   Then I took it from there.

5               Q.   So whether or not the decision was made

6       before or after you talked with Mr. Lankford, that

7       wasn't a concern of yours?   You weren't a part of

8       the investigation?

9               A.   I was not part, correct, but I do

10      remember when I informed Mr. Luke that he was going

11      into rehab, he said he was conducting an

12      investigation and we couldn't do anything until he

13      came back.

14              Q.   I want you to look back on Exhibit 9,

15      the e-mail you sent to Dan and Doug Oehler

16      informing them of Mr. Lankford's rehab and leave of

17      absence, among other things, is dated February 4th,

18      2014 at 8:57 a.m.

19                     Do you see that?

20              A.   Correct.

21              Q.   All right.   And then Mr. Oehler

22      responds shortly after that and then after having,

23      and then I want to jump back to Exhibit 10.   Now,

24      after having the report for over a week, you now,

25      for the first time, forward the report to Ann

1    Boeckermann, who was acting as human resources.

2                Is there any reason that you

3    waited a week-and-a-day, but only less than an

4    hour-and-a-half after you had some e-mails back and

5    forth about Mr. Lankford's rehab, is there any

6    connection there?

7                MR. WINTERS:  Objection, I think

8    it's confusing.  You may answer if you understand.

9                THE WITNESS:  Well, let's see, I

10    have five locations, over 100 associates, I'm in

11    and out of the office.  So I have no idea.  I can

12    be behind my desk sometimes and can reply,

13    sometimes I have to wait a day.  It could be two

14    days so I do not recall, but there is a, are you

15    asking was there a connection?

16    BY MR. MANSELL:

17        Q.  Did somebody tell you to forward this

18    report to Ann Boeckermann?

19        A.  No.

20        Q.  Did you have a conversation with Dan

21    Oehler or Doug Oehler about the report that's

22    attached to Exhibit 10?

23        A.  To the best of my knowledge, I never

24    talked to Dan or Doug about the investigation.

25        Q.  I'm handing you what's been previously

1 marked as Plaintiff's Exhibit 5.  It's three pages.

2 There's an e-mail chain on the first page, and then

3 two pages of an attachment.

4    A. Okay.

5    Q. All right.  I want you to first look at

6 the second and third pages of Exhibit 5.  The

7 second page appears to be the initial report you

8 received back in January, correct?

9    A. Correct.

10    Q. And then the second page is additional

11 notes on the report after a February 4, 2014 visit

12 by David Luke to Covington Auto Body.  Do you see

13 that?

14    A. Yes.

15    Q. Were you aware that Mr. Luke was going

16 to Covington Auto Body on February 4th?

17    A. He did not tell me to the best of my

18 knowledge beforehand, but I was informed, I

19 believe, after the fact, but I do not remember if

20 it was before or after.

21    Q. All right.  And if you look at the

22 bottom of Page 1, there's an e-mail from David Luke

23 to yourself and Tim Mastropaolo dated February 5th,

24 2014 at 11:11 a.m.

25       Do you see that?

1          A.   Yes.

2          Q.   And you forwarded that e-mail and the

3     two-page report to Dan Oehler and Doug Oehler on

4     February 5th, 2014 at 11:17 a.m., approximately,

5     six minutes later.  Do you see that?

6          A.   Correct.

7          Q.   All right.  Why did you forward this

8     report to Dan Oehler?

9          A.   To inform them of where we were on the

10    investigation.

11         Q.   But prior to this, you hadn't talked

12    with him at all about the investigation?

13         A.   To the best of my knowledge, no.

14         Q.   And you hadn't forwarded him any

15    e-mails --

16         A.   To the best of my knowledge, yes.

17         Q.   Is there a reason why you're sending it

18    to Dan Oehler and copying it to Doug since Doug is

19    your direct supervisor?  I just didn't know if

20    there was any reason why Dan is the recipient and

21    Dan is copied?

22         A.   No idea why I did that, no.  As long as

23    they both got it, I was not concerned with --

24         Q.   All right.  Now, the top e-mail is an

25    e-mail from Dan Oehler to Walt Rodgers and you're

1    copied on it.  Do you see that?

2              A.   Correct.

3              Q.   Dated February 5th, 2014 at 10:57 p.m.?

4              A.   Yes.

5              Q.   It says, Walt, Tony may have sent this

6    to you also, but I want to make sure that you have,

7    as well.  I discussed with Tony today my thoughts,

8    but we need to consult with you regarding his rehab

9    condition.

10                       Do you see that?

11             A.   Correct.

12             Q.   Okay.  And the first part of the second

13   sentence, I discussed with Tony today my thoughts,

14   do you recall having a conversation with Dan Oehler

15   on February 5th, 2014?

16             A.   No, I do not.

17             Q.   Do you remember any thoughts on this

18   subject that Mr. Oehler shared with you?

19             A.   No, I do not.

20             Q.   Okay.  And the second part of sentence,

21   we need to consult with you regarding his rehab

22   condition, do you remember consulting with Walt

23   Rodgers regarding Mr. Lankford's rehab condition?

24             A.   No.

25             Q.   Did Dan Oehler give the go-ahead to

1    fire Mr. Lankford?

2        A.  To the best of my knowledge, I received

3    the authority from Walt Rodgers, nothing from Dan

4    Oehler.

5        Q.  Would Dan Oehler, in your experience,

6    have the authority to terminate one of your sales

7    reps?

8        A.  With him being the vice-president, I

9    would believe, whatever he told me to do, I would

10   do.

11                   (WHEREUPON, Plaintiff's Exhibit 11

12   was marked for identification.)

13   BY MR. MANSELL:

14       Q.  I'm going to hand you what's been

15   marked as Plaintiff's Exhibit 11.  Let me know when

16   you've had a chance to review that.

17       A.  Okay.

18       Q.  Okay.  And so, the bottom two e-mails

19   on the page is what we've seen previously that

20   David Luke forwarded you and then you forwarded it

21   on to Dan and Doug Oehler, correct?

22       A.  And Doug Oehler in this e-mail chain

23   responds to you, and Dan Oehler and says, the last

24   two reports from Paul are terrible and really

25   questions many things going on.  I would like to

1      make a change in this territory.  Reps need to be
2      reliable and trusted.  He has proven different in
3      many cases.
4                      Did I read that correctly?
5                      MR. WINTERS:  You did not.  It
6      says, I would like to make a change, and he
7      wrote I would plan.
8      BY MR. MANSELL:
9              Q.   Let's strike that then.  I would plan
10     to make a change, starting on the second sentence,
11     I would plan to make a change in this territory.
12     Reps need to be reliable and trusted.  He has
13     proven different in many cases.
14                     Did I read that correctly?
15             A.   Yes.
16             Q.   And it was your understanding that the
17     last two reports Mr. Oehler is referring to are the
18     reports from, on Mr. Lankford going out on medical
19     leave that you explained in your e-mail on February
20     4th and the two-page report attached to the e-mail
21     you forwarded earlier that day?
22             A.   Yeah.  You would have to ask Doug that.
23     I have no idea what two reports he's talking about.
24             Q.   You didn't have an understanding on
25     your own?

1          A.   All I know is the investigation was an

2    ethics violation so I would assume, well, I'm not

3    going to assume, but you would have to ask Doug.

4          Q.   Was the report, did the report have

5    anything to do with Mr. Lankford's reliability, the

6    report attached to this document, the two-page

7    report from David Luke?

8          A.   I don't recall.

9          Q.   Well, it had to do with

10   misappropriation of product, correct?

11         A.   Yeah.

12         Q.   And so, you could review the report, if

13   you would like, but I would just like to know if

14   you think there's anything in that report that

15   deals with reliability?

16         A.   Oh, yes.  If you can't trust, if

17   someone's misappropriating funds, to me, that's,

18   you can't rely on them.

19         Q.   Okay.  And did you respond to Doug

20   Oehler's e-mail and state, I agree we need to be

21   careful how we handle due to his rehab and

22   lawsuits, but I think we have enough to dismiss.

23              Did I read that correctly?

24         A.   Correct.

25         Q.   What did you mean by we need to be

1     careful how we handle due to his rehab and
2     lawsuits?
3              A.  Because when I informed David Luke of
4     him going into rehab, that's when he said to hold
5     off.  We cannot do anything until he gets back and
6     the investigation is done.
7              Q.  Okay.  And what is lawsuits, rehab and
8     lawsuits?
9              A.  When I, as I stated, when I approached
10    David Luke, he said we can't do anything due to
11    lawsuits until he gets back.
12             Q.  And then you finished the sentence, but
13    I think we have enough to dismiss.  What did you
14    mean by that?
15             A.  When someone steals, that's enough to
16    dismiss.
17             Q.  So based on the contents of the report,
18    you thought, you think we have enough to dismiss?
19             A.  Yes.  I thought we had enough to
20    dismiss due to the investigation.
21             Q.  But you hadn't talked with Mr. Lankford
22    at that point yet, correct?
23             A.  No.
24             Q.  So was a final decision made at that
25    time?  Do you know?

1          A.  To the best of my knowledge, the final

2  decision was made when I received the e-mail from

3  Walt Rodgers.

4          Q.  At the bottom of the page on Exhibit

5  11, your e-mail after you got the David Luke report

6  says, David Luke to send more information.  Do you

7  see that?

8          A.  Yes.

9          Q.  Okay.  Do you remember what information

10  Mr. Luke was going to send?

11          A.  To the best of my knowledge, further

12  information on the investigation.

13          Q.  Had you seen any documentation as of

14  February 5th, 2014, any additional information at

15  that point?

16          A.  All the documentation I received was

17  through e-mail.

18                 (WHEREUPON, Plaintiff's Exhibit 12

19  was marked for identification.)

20  BY MR. MANSELL:

21          Q.  I'm going to hand you what's been

22  marked as Plaintiff's Exhibit 12.  Let me know when

23  you have had a chance to review Plaintiff's Exhibit

24  12.

25          A.  Okay.

1          Q.   All right.   The first page is an e-mail
2     from David Luke to Rodgers, Doug and Dan Oehler,
3     correct?
4          A.   Correct.
5          Q.   And the attachments are, well, have you
6     seen these attachments before?
7          A.   This e-mail I have not seen, but he did
8     show me at one time, and I don't remember when or
9     how, I've seen this before.
10          Q.   Who's shown you it?
11          A.   David Luke did.
12          Q.   And you're referring to the second
13     page?
14          A.   Yes.
15          Q.   Okay.   And what about the third page?
16          A.   I do not remember seeing those.
17          Q.   What about the fourth page?
18          A.   At one time, I do remember seeing that,
19     yes.
20               MR. MANSELL:   Let's take a quick
21     break.   I want to make a copy of an exhibit.
22               (WHEREUPON, a recess was taken.)
23               (WHEREUPON, Plaintiff's Exhibit 13
24     was marked for identification.)
25     BY MR. MANSELL:

1          Q.   Mr. Downs, we are back on the record,

2     and I've handed you what's been marked as

3     Plaintiff's Exhibit 13.  Let me know when you've

4     had a chance to review that.

5          A.   (Witness reviews document.)  Okay.

6          Q.   You talked about receiving an e-mail

7     from Walt Rodgers citing a portion of the employee

8     handbook, right?

9          A.   Correct.

10         Q.   And I want to direct you to the middle

11    of the first page here.  There's an e-mail from

12    Walt Rodgers to yourself and David Luke copied on

13    it.  Do you see that?

14         A.   Yes.

15         Q.   And is this the e-mail that you've been

16    referring to?

17         A.   Yes.

18         Q.   So you know, at least at this point,

19    the decision in your mind was final?

20         A.   Yes.

21         Q.   And then if, you don't know if maybe

22    the decision had been made and finalized prior to

23    this; is that accurate?

24         A.   That is accurate.

25         Q.   And it says, termination strategy.  Do

Case: 1:14-cv-00602-KLL Doc #: 32 Filed: 09/16/15 Page: 33 of 56 PAGEID #: 1009

1    you see that?

2           A.   Yes.

3           Q.   Did you talk termination strategy with

4    Mr. Rodgers?

5           A.   I do not recall a termination strategy,

6    no.

7           Q.   Do you recall any further participation

8    on your end regarding the misappropriation issue

9    from the time you got this e-mail on February 6th

10   until the time you met with Mr. Lankford?

11          A.   Do I recall any further discussions on

12   the investigation or termination?

13          Q.   Investigation.

14          A.   No.

15          Q.   And so, this is on February 6th.  You

16   forwarded on February 7th, Dan Oehler confirms

17   later that day.  Do you see that?

18          A.   Yes.

19          Q.   And then from that point until the time

20   you met, physically met with Mr. Lankford, there

21   was no other involvement on your end?

22          A.   No.

23          Q.   All right.  Tell me what you did to

24   prepare for the termination meeting?  Did you do

25   anything, review anything at that point?

```
 1              A.  I do not recall what I reviewed.  David

 2     Luke and myself met in the conference room before

 3     Paul got there.  We had all the paperwork

 4     necessary, and I don't remember if I read through

 5     the investigation again, but it was not much

 6     preparation.  It's not like we sat down and had a

 7     strategy.

 8                       MR. MANSELL:  Can we go off the

 9     record real quick?

10                       (WHEREUPON, discussion off the

11     record was had.)

12     BY MR. MANSELL:

13              Q.  You said that you and Mr. Luke met and

14     prepared and you had all the appropriate paperwork?

15              A.  Yes, there was really no strategy.  It

16     was black and white.  He stole from the company.

17     It was pretty easy.

18              Q.  And did you fill out the exit interview

19     paperwork?

20              A.  Yes.

21              Q.  And did you do that before the meeting,

22     during the meeting, after the meeting?

23              A.  I'm not sure what parts were filled out

24     when.  I do not recall.

25              Q.  How long did the meeting last for?
```

1          A.   To the best of my knowledge, 45

2     minutes.

3          Q.   Who did most of the talking?  Was it

4     you or Mr. Luke or a combination?

5          A.   Mr. Luke did most of the talking.

6          Q.   Anything related to the investigation,

7     would you be getting that information from Mr. Luke

8     anyway?

9          A.   Yes.  He went through the investigation

10    with Mr. Lankford.

11         Q.   Are you aware of any other sales reps

12    that have either worked for you or you have

13    knowledge of with RelaDyne that have been

14    terminated for using samples for personal use or

15    something similar to what Mr. Lankford did in this

16    situation?

17         A.   Since I've been with RelaDyne, no.

18    Prior to that, I don't have any idea.

19         Q.   And when you started with RelaDyne was

20    when?

21         A.   Around February, it's been over two

22    years.  It'll be three years February 1st, I

23    believe, of 2016.

24         Q.   The e-mail on Exhibit 13 where Dan

25    Oehler is confirming to move forward with the

1      termination, is that something that Dan Oehler

2      would have to authorize in the situation?  What did

3      you understand him saying, confirmed, to mean?

4              A.  Confirmed as far as Walt's response.

5              Q.  He's agreeing?

6              A.  Right.  Correct.  Is my interpretation.

7      You would have to ask Dan.

8              Q.  Did anyone ever call you after Mr.

9      Lankford left RelaDyne for any reference, job

10     reference about Mr. Lankford?

11             A.  No job references.

12             Q.  All right.  Are there any conversations

13     or meetings that you had related to Mr. Lankford's

14     rehab or leave of absence, medical leave of absence

15     that we haven't discussed here today?

16             A.  To the best of my knowledge, no.

17             Q.  Okay.  Is there any conversations or

18     meetings that you had with anybody from RelaDyne

19     about Mr. Lankford's termination on

20     misappropriation of product that we haven't

21     discussed here today?

22             A.  To the best of my knowledge, no.

23                     (WHEREUPON, Plaintiff's Exhibit 14

24     was marked for identification.)

25     BY MR. MANSELL:

1          Q.  I'm going to hand you what's been
2     marked as Plaintiff's Exhibit 14.  Let me know when
3     you've had a chance to look over this e-mail.
4          A.  (Witness reviews document.)  I have.
5          Q.  And I want to direct you to the middle
6     of the page.  Ann Boeckermann asks you on February
7     17th, how did it go?  Do you see that?
8          A.  Yes.
9          Q.  I'm assuming she's referring to the
10    termination meeting?
11         A.  I would assume, but I do not know.
12         Q.  Is that what you assumed when you
13    responded above?
14         A.  Yes.
15         Q.  And you say, not bad.  Poor thing
16    looked like he was high on something.  Feel sorry
17    for him.  Do you see that?
18         A.  Yes.
19         Q.  Why do you think Mr. Lankford looked
20    high?  What was your perception?
21         A.  I mean, his eyes did not look right,
22    his actions.  I was very scared for him.  I noted
23    that on his exit interview, and I was, almost
24    wanted to call the cops.  I was very worried as far
25    as liability of him leaving and maybe getting into

1    an accident.  It was, I was scared for him.

2              Q.   What do you mean by high?

3              A.   Like, we did not, I did not smell

4    alcohol, but he looked like he was high.  I mean,

5    he was fidgety, just like that's, high on

6    something, on a pill.  I don't know.  It could have

7    been, I don't think it was alcohol, but it was,

8    something was, in my opinion, he did not seem 100

9    percent there.

10             Q.   And is that the first time you ever saw

11   Mr. Lankford like that?

12             A.   Yes.

13             Q.   And you were aware that Mr. Lankford

14   had a drinking problem prior to him going to

15   Florida; is that right?

16             A.   I had heard, yes, some.  Tim had told

17   me, when I had told Tim that he was in rehab that,

18   because Tim was the GM before me, that he had gone

19   in before.

20             Q.   While he was an employee of Oil

21   Distributing or sometime before you got there?

22             A.   Correct.

23             Q.   And Tim had knowledge of that and told

24   you?

25             A.   Correct.

1          Q.  All right.  Any other conversations

2      about Mr. Lankford's rehab either the time in 2014

3      or his previous time?

4          A.  No.

5          Q.  Did you have any issue or concern that

6      Mr. Lankford did not finish his rehab program?

7          A.  Did I have any concerns?  To me, that

8      didn't even enter my mind because once the

9      investigation was done, it really did not matter.

10          Q.  And you weren't his treating physician

11      to know whether or not he was able to return to

12      work or what his condition was, right?

13          A.  I saw no paperwork.

14              MR. MANSELL:  All right.  I don't

15      have anything further.

16              MR. WINTERS:  I have nothing.  We

17      will have signature if it's ordered.

18              (WHEREUPON, the deposition

19      concluded at 12:59 p.m.)

20

21          *      *      *      *      *

22

23

24      _____
                        CHARLES ANTHONY DOWNS

25

1                    C E R T I F I C A T E

2


3       STATE OF OHIO
                         SS.
4       COUNTY OF MONTGOMERY

5


6              I, Lainey Fergueson, the undersigned, a
        Certified Shorthand Reporter, and Notary Public
7       within and for the State of Ohio, do hereby certify
        that before the giving of aforesaid deposition said
8       CHARLES ANTHONY DOWNS, was by me first duly sworn
        to state the truth, the whole truth, and nothing
9       but the truth; that the foregoing is the deposition
        given at said time and place by said CHARLES
10      ANTHONY DOWNS; that said deposition was taken in
        stenotypy by the court reporter and transcribed
11      into typewriting under her supervision; that said
        transcribed deposition was submitted to the witness
12      for his examination; the court reporter was neither
        a relative of nor attorney for any of the parties
13      to this case nor relative of nor employee for any
        of the counsel; neither the court reporter nor the
14      affiliated court reporting firm has a financial
        interest under a contract as defined in Civil Rule
15      28(D).

16             IN WITNESS WHEREOF, I hereunto set my
        hand and official seal of office this 31st day of
17      August, 2015.

18

19

20                        _____
                          LAINEY FERGUESON, CSR
                          Notary Public, State of Ohio
21                        My Commission Expires 12-24-18

22

23

24

25

1    PLEASE USE THIS ERRATA SHEET TO MAKE ANY
     AND ALL CORRECTIONS, BY LISTING THE PAGE NUMBER,
2    LINE NUMBER AND THEN A BRIEF DESCRIPTION OF THE
     ERROR.  PLEASE DO NOT MAKE ANY MARKS OR CORRECTIONS
3    ON THE TRANSCRIPT.  IF NEEDED USE THE BACK OF THIS
     SHEET.  UPON COMPLETION PLEASE SIGN AND DATE THIS
4    SHEET AT THE BOTTOM.  THANK YOU.

5    _____
     _____
6    _____
7    _____
8    _____
9    _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
20   _____
21   _____
22   _____
23   _____
24   SIGNATURE:_____DATE:_____

25

57

1      A.    I have no idea what he thought.  That has

2   nothing to do with the termination and that's the only

3   thing I was concerned about.

4      Q.    Sure.  But this is the e-mail that you received

5   giving you directive to terminate Mr. Lankford, correct?

6      A.    Yeah, at the very top it states that.

7      Q.    This e-mail chain?

8      A.    The e-mail chain, yes.

9      Q.    Okay.

10          MR. FRIEDMANN:  Okay.  I have no further

11   questions.

12          MR. BERNAT:  We'll take signature.  If he

13   orders, e-mail it to me and I'll get him to sign.

14          (Deposition concluded at 12:01 p.m.)

15                       - - -

16                                                   8/28/15

17          CHARLES ANTHONY DOWNS

18                       - - -

19   (LJ)

20

21

22

23

24

25

# E R R A T A  S H E E T

To Lori Jay, I have read the entire transcript of my deposition taken on March 25, 2015, and
have made the following corrections.  I have signed my name to the signature page and
authorize you to attach the following changes to the original transcript.

| PAGE | LINE | CORRECTION |
|------|------|------------|
| | | *NONE.* |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

_Charles Anthony Downs_ 5/28/15
Charles Anthony Downs

Charlene Nicholas & Associates, LLC
5136 Phillipsburg-Union Road, Englewood OH 45322
Phone: (937) 836-7878   Fax: (937) 836-1718

**Gregory Mansell**

| | |
|---|---|
| **From:** | Tony Downs |
| **Sent:** | Monday, February 03, 2014 8:25 AM |
| **To:** | Bob Johnson; Dan Oehler |
| **Subject:** | RE: Paul Lankford / TireMan |

He has told some he is out on medical leave – Thanks - TD

---

**From:** Bob Johnson
**Sent:** Monday, February 03, 2014 8:13 AM
**To:** Dan Oehler; Tony Downs
**Subject:** Paul Lankford / TireMan

Guys:

With Paul being out, I am happy to coordinate with Brian @ UCI for Friday's meeting. Wondering what I should communicate as to why Paul is out?

*Bob Johnson*
*Automotive Channel Manager*
*317-696-3009*



**RelaDyne**
*Reliability in Motion*

**Connect with RelaDyne:**

   



PLAINTIFF'S EXHIBIT
7
PENGAD 800-631-6989

**Gregory Mansell**

| | |
|---|---|
| **From:** | Tony Downs |
| **Sent:** | Tuesday, February 04, 2014 8:57 AM |
| **To:** | Dan Oehler; Douglas Oehler |
| **Subject:** | FW: Paul Lankford / Tire Man |

FYI – Paul L checked himself into rehab last Thursday in Florida for 35 days due to drinking – He told me he had notified the "Oehler's" so I take it he had talked to you two – He claims he told some of his customers he would be on medical leave and gave them contact names and numbers - - Donna is calling from the inside and I have Phil Marino handling his larger volume accounts – I did talk to Bob Kemper from Grismer Tire and he has been very unhappy with Paul for not calling on his Manager's at the stores (Phil to visit all stores) and wants Paul off his account – We will let him cool down and I will visit with Bob and get his account settled – Let me know if you have any other suggestions – Walt R has been notified as well - Thanks - TD

---

**From:** Bob Johnson
**Sent:** Monday, February 03, 2014 8:13 AM
**To:** Dan Oehler; Tony Downs
**Subject:** Paul Lankford / TireMan

Guys:

With Paul being out, I am happy to coordinate with Brian @ UCI for Friday's meeting. Wondering what I should communicate as to why Paul is out?

*Bob Johnson*
*Automotive Channel Manager*
*317-696-3009*



**RelaDyne**
Reliability in Motion

**Connect with RelaDyne:**




**PLAINTIFF'S EXHIBIT**
8

**Gregory Mansell**

| | |
|---|---|
| **From:** | Dan Oehler |
| **Sent:** | Tuesday, February 04, 2014 9:02 AM |
| **To:** | Tony Downs; Douglas Oehler |
| **Cc:** | Walt Rodgers |
| **Subject:** | RE: Paul Lankford / Tire Man |

Tony—He did NOT tell me. I found out yesterday from Bob Johnson. I'm in Houston and we will need to discuss this. We have too many signs to ignore and not proactively address.

Dan Oehler
VP of Sales and Marketing
RelaDyne, LLC
www.RelaDyne.com

9395 Kenwood Rd. Ste #104
Blue Ash, OH 45242

(o) 513.247.1443
(m) 513.476.4957

---

**From:** Tony Downs
**Sent:** Tuesday, February 04, 2014 8:57 AM
**To:** Dan Oehler; Douglas Oehler
**Subject:** FW: Paul Lankford / Tire Man

FYI – Paul L checked himself into rehab last Thursday in Florida for 35 days due to drinking – He told me he had notified the "Oehler's" so I take it he had talked to you two – He claims he told some of his customers he would be on medical leave and gave them contact names and numbers - - Donna is calling from the inside and I have Phil Marino handling his larger volume accounts – I did talk to Bob Kemper from Grismer Tire and he has been very unhappy with Paul for not calling on his Manager's at the stores (Phil to visit all stores) and wants Paul off his account – We will let him cool down and I will visit with Bob and get his account settled – Let me know if you have any other suggestions – Walt R has been notified as well - Thanks - TD

---

**From:** Bob Johnson
**Sent:** Monday, February 03, 2014 8:13 AM
**To:** Dan Oehler; Tony Downs
**Subject:** Paul Lankford / TireMan

Guys:

With Paul being out, I am happy to coordinate with Brian @ UCI for Friday's meeting. Wondering what I should communicate as to why Paul is out?

***Bob Johnson***
Automotive Channel Manager
317-696-3009





PLAINTIFF'S
EXHIBIT
9

1

**Gregory Mansell**

| | |
|---|---|
| **From:** | Tony Downs |
| **Sent:** | Tuesday, February 04, 2014 10:23 AM |
| **To:** | Ann Boeckermann |
| **Subject:** | FW: Investigation into misappropriation of product |
| **Attachments:** | Investigation into misappropriation of product.docx |

**Tony Downs**
General Manager

**RelaDyne – *Reliability in Motion***
5228 River Road – Cincinnati, OH. 45233-1643
513-467-3148 Direct | 513-467-3100 Main
859-948-4992 Mobile |513-467-3486 Fax
tony.downs@reladyne.com
www.reladyne.com



---

**From:** David Luke
**Sent:** Monday, January 27, 2014 3:16 PM
**To:** Tim Mastropaolo; Tony Downs
**Subject:** Investigation into misappropriation of product

Here is a written report on the allegation(s) against Paul Lankford.-Dave



## Investigation into misappropriation of product

There has been an allegation against Paul Langford regarding misappropriation of product with the intent to defraud a customer.

According to the complainant lodged by the Manager (Dan) of Covington Auto Body located at 2111 Mote Dr. Covington, Ohio 45318, Paul Lankford approached him regarding a chartable event involving a local Charity. The arrangement was to be, Oil Distributing would donate oil and filters for six (6) oil changes, which were to be raffled off through this charity. Covington Auto body was to use the donated oil and filter and preform the oil changes in hopes of attracting new customers.

The first person to have their oil changed was Paul's mother, who stated to Dan the manager that Paul gave her the oil changes for Christmas as a gift.

The second customer who came into the shop for an oil change was Paul's sister-in-law.

Being suspicious of what might be going on, Dan contacted the charity and talked to someone he knew and asked if Paul Lankford, Oil Distributing Company or Reladyne was involved in type of donations? After checking the records, no evidence could be found relating to any donations made by Paul, ODC, or Reladyne.

Upon making his delivery of several cases of oil and one case of filters to Covington Auto Body our driver Bruce Gee asked the Manager Dan, how does he rate getting products for free? Dan started to explain how the deal was supposed to work. Dan stated Paul told him if Covington Auto body would do the changes as part of their donation and it would generate new business for him. Dan feels like he is losing money in labor and in topping off all the fluids during an oil change and he was duped into doing these oil changes

Upon hearing this allegation Bruce contacted his supervisor Mark Mielnicki who notified Tim Mastropaolo the Director of Operations. Once Tim had this information he contacted me to look into this matter on January 14, 2014.

Bruce Gee contacted me to inform me that the third oil change had occurred ant Covington Auto Body, the customer stated he was a buddy of Paul's and Paul gave to him as a Christmas gift.

The plan is to interview Dan of Covington Auto Body and to obtain the name of the charity and the contact person to review and obtain documentation on the charity.

**Gregory Mansell**

| | |
|---|---|
| **From:** | Douglas Oehler |
| **Sent:** | Wednesday, February 05, 2014 11:27 AM |
| **To:** | Tony Downs; Dan Oehler |
| **Subject:** | RE: Paul Lankford report |

This is separate issue and warrants loss of job, in my mind we keep it to just this topic if we choose to replace

---

**From:** Tony Downs
**Sent:** Wednesday, February 05, 2014 11:26 AM
**To:** Douglas Oehler; Dan Oehler
**Subject:** RE: Paul Lankford report

I agree – We need to be careful how we handle due to his Rehab and lawsuits but I think we have enough to dismiss – Thanks - TD

---

**From:** Douglas Oehler
**Sent:** Wednesday, February 05, 2014 11:22 AM
**To:** Tony Downs; Dan Oehler
**Subject:** RE: Paul Lankford report

The last two reports from Paul are terrible and really questions many things going on. I would plan to make a change in this territory. Reps need to be reliable and trusted , he has proven different in many cases.

---

**From:** Tony Downs
**Sent:** Wednesday, February 05, 2014 11:17 AM
**To:** Dan Oehler
**Cc:** Douglas Oehler
**Subject:** FW: Paul Lankford report

FYI – Dave Luke to send more information – Thanks - TD

---

**From:** David Luke
**Sent:** Wednesday, February 05, 2014 11:11 AM
**To:** Tim Mastropaolo; Tony Downs
**Subject:** Paul Lankford report

Here is the report on Paul I combined both reports page 1 and page 2, I will scan all documents I have so we can send it to Dan and Walt-Dave



1

**Gregory Mansell**

| | |
|---|---|
| **From:** | David Luke |
| **Sent:** | Thursday, February 06, 2014 11:08 AM |
| **To:** | Walt Rodgers; Dan Oehler; Douglas Oehler |
| **Subject:** | Paul lankford |
| **Attachments:** | Paul Lankford report.docx; Paul Lankford.pdf |

Here is the supporting documents along with the report you already should have.

Thank you

David Luke
Director of Loss Prevention
Safety and Compliance
Reladyne LLC
(O): 513-467-3115
(C): 513-378-9715
david.luke@reladyne.com
"Safety is non – negotiable it is a condition of employment"




PLAINTIFF'S EXHIBIT

PENGAD 800-631-6989

1

1 free duramax full svc.
oil change. Compliments
of Express tire and auto
centers and Reladyne

R Paul Lankford

1 free dura max full svc.
oil Change.
Complementary of express
tire and auto center and
R Paul ___ Reladyne

These are the Cards that were used to
redeem oil Changes. issued by Paul
Lankford. placed on the back of business
Cards!

This is the Cards that are issued for any type
of charitable event/donation for free oil changes.



Valvoline
Express CARE
Authorized Installer

Covington Body Shop
& Service Dept.
2111 Mote Drive
Covington, Oh. 45318
937-473-3355

4263

# 25⁼
cc

This card is not redeemable for cash, and lost or stolen
cards will not be replaced except as required by law. At
merchants option, card expires 12 months after date of
purchase, except where prohibited.
May be used at any Express Tire & Auto Centers locations

# TROY EXPRESS TIRE & AUTO CENTER

846 W. MAIN ST.
TROY, OH 45373
Phone: (937) 440-6449
Fax: (937) 440-8112
Email:
Web Address: WWW.ETAC1.NET

Page 1 of 1

Invoice

67825

Estimate Ref #: 6,711
Date Printed: 02/04/2014
Printed Time: 10:51 am

| Hat/Ref # | | " IMPECCABLE SERVICE, DRIVEN BY INTEGRITY" | | | | | Time Promised: |
|---|---|---|---|---|---|---|---|

**Lankford, Tish**
109 REGENCY CT.
COVINGTON, OH 45318
Home: (937) 335-9993
Cell:                Email:

2004 FORD FOCUS LX L4 2.0L 1989CC 122CID FI GAS N P
VIN:1FAFP33P64W156097
License: FMQ6846
Unit #:

Mileage In: 85,685
Mileage Out: 85,685
DOM:

Date Written: 01/03/2014
Written By:DONN GOFF
Save Old Parts: No

| Job Name | | Description | Technician | Qty | List | Extended |
|---|---|---|---|---|---|---|
| F/S DURAMAX LOF | | FULL SERVICE DURAMAX LUBE OIL AND FILTER | MICHAEL EPLEY | | | |
| Labor | TEC | Work Requested - F/S DURAMAX LUBE OIL AND FILTER | | | | $10.99 |
| Work Performed - FULL SERVICE LUBE OIL AND FILTER | | | | | | |
| Part | 5W30 DURAMAX | DURAMAX SYNTHETIC BLEND OIL GF-5 | | 5.00 | $3.00 | $15.00 |
| Part | M195 / VO23 | OIL FILTER | | 1.00 | $4.00 | $4.00 |
| | | | | | Discount: | $29.99 |

| Payment Date | Type | Method | Amount |
|---|---|---|---|
| | | Payment Totals: | |

| | |
|---|---|
| Parts: | $19.00 |
| Labor: | $10.99 |
| Sublet: | $0.00 |
| Misc: | $0.00 |
| Discount: | $29.99 |
| Hazmat: * | $0.00 |
| Supplies: * | $0.00 |
| Tax Total: | $0.00 |
| Invoice Total: | $0.00 |
| Less Paid: | $0.00 |
| Balance Due: | $0.00 |

### THANK YOU FOR CHOOSING TROY EXPRESS

I hereby authorize the above repair work to be done along with the necessary material and hereby grant you and/or your employees permission to operate the car or truck herein described on streets, highways or elsewhere for the purpose of testing and/or inspection. An express mechanic's lien is hereby acknowledged on above car or truck to secure the amount of repairs thereto.

Authorized By _____    Date _____    Time _____

**Gregory Mansell**

| | |
|---|---|
| **From:** | Dan Oehler |
| **Sent:** | Friday, February 07, 2014 12:25 PM |
| **To:** | Tony Downs; Douglas Oehler |
| **Subject:** | RE: Paul Lankford report |

Confirmed.

Dan Oehler
VP of Sales and Marketing
RelaDyne, LLC
www.RelaDyne.com

9395 Kenwood Rd. Ste #104
Blue Ash, OH 45242

(o) 513.247.1443
(m) 513.476.4957

**From:** Tony Downs
**Sent:** Friday, February 07, 2014 8:22 AM
**To:** Dan Oehler; Douglas Oehler
**Subject:** FW: Paul Lankford report

FYI

**From:** Walt Rodgers
**Sent:** Thursday, February 06, 2014 8:50 AM
**To:** Tony Downs
**Cc:** David Luke
**Subject:** RE: Paul Lankford report

Tony – We need to talk termination strategy. Per our Disciplinary Action Policy on page 50 of the Associate Handbook, we are in the clear to move on him.

513-247-1440

Thanks!

Walt


Ps Dave Luke – very nice work here. Thank you!


**From:** Dan Oehler
**Sent:** Wednesday, February 05, 2014 10:57 PM
**To:** Walt Rodgers
**Cc:** Tony Downs; Douglas Oehler
**Subject:** FW: Paul Lankford report



PLAINTIFF'S EXHIBIT 13
PENGAD 800-631-6989

1

Walt: Tony may have sent this to you also, but I want to make sure that you have as well. I discussed with Tony today my thoughts, but we need to consult with you regarding his rehab condition. I'm happy to interject my opinions when desired. I have great loyalty of course to my past team, and I believe in Paul's capabilities. However, his lapses and ethics have both passed that loyalty.

Dan Oehler
VP of Sales and Marketing
RelaDyne, LLC
www.RelaDyne.com

9395 Kenwood Rd. Ste #104
Blue Ash, OH 45242

(o) 513.247.1443
(m) 513.476.4957

**From:** Tony Downs
**Sent:** Wednesday, February 05, 2014 11:17 AM
**To:** Dan Oehler
**Cc:** Douglas Oehler
**Subject:** FW: Paul Lankford report

FYI – Dave Luke to send more information – Thanks - TD

**From:** David Luke
**Sent:** Wednesday, February 05, 2014 11:11 AM
**To:** Tim Mastropaolo; Tony Downs
**Subject:** Paul Lankford report

Here is the report on Paul I combined both reports page 1 and page 2, I will scan all documents I have so we can send it to Dan and Walt-Dave

2

**Gregory Mansell**

**From:** Tony Downs
**Sent:** Monday, February 17, 2014 12:00 PM
**To:** Ann Boeckermann
**Subject:** RE: Paul Lankford

Not bad – Poor thing looked like he was "high" on something – Feel sorry for him!!!!

**Tony Downs**
General Manager

**RelaDyne –** *Reliability in Motion*
5228 River Road – Cincinnati, OH. 45233-1643
513-467-3148 Direct | 513-467-3100 Main
859-948-4992 Mobile | 513-467-3486 Fax
tony.downs@reladyne.com
www.reladyne.com



**From:** Ann Boeckermann
**Sent:** Monday, February 17, 2014 11:55 AM
**To:** Tony Downs
**Subject:** RE: Paul Lankford

How did it go?

**From:** Tony Downs
**Sent:** Monday, February 17, 2014 11:50 AM
**To:** Chris Chaille; Ann Boeckermann; David Luke
**Subject:** FW: Paul Lankford

FYI

**From:** Nick Kessinger
**Sent:** Monday, February 17, 2014 11:44 AM
**To:** Tony Downs
**Subject:** RE: Paul Lankford

Let me dig through my records. I know we sent those sales guys some netbooks a while ago, but not everyone got one. Let me check my records and get back to you. I am still working on disabling everything and will let you know when it is completed.

Nick Kessinger
IT Tech Support Rep – RelaDyne
O 513.247.1451
Nick.Kessinger@RelaDyne.com



PLAINTIFF'S
EXHIBIT
14

1