1          UNITED STATES DISTRICT COURT

2          SOUTHERN DISTRICT OF OHIO

3              WESTERN DIVISION

4    _____

5   ROGER PAUL LANKFORD,   :

6          Plaintiff      :

7     -vs-                 : CASE NO. 1:14-CV-682

8   RELADYNE, LLC, ET AL, :

9          Defendants     :

10   _____

11

12          Deposition of WALTER RODGERS, a witness

13    herein, taken by the Defendants as upon cross

14    examination and pursuant to the Federal Rules of

15    Civil Procedure as to the time and place and

16    stipulations hereinafter set forth, at the offices of

17    Britton & Associates, 201 Riverside Drive, Suite 2-B,

18    Dayton, Ohio at 10:00 a.m. on June 30th, 2015, before

19    Lainey Fergueson, a CSR, and Notary Public within and

20    for the State of Ohio.

21

22

23          *    *    *    *    *    *

24

25

1                    QUICK REFERENCE INDEX

2        WITNESS:  WALTER RODGERS

3        APPEARANCES:  PAGE 3

4

5                         DX    CX    RDX    RCX

6        BY:  MR. MANSELL    -     4     -      -

7

8                            EXHIBITS

9               IDENTIFIED                   PAGE

10       PLF'S:        1                     15

11       PLF'S:        2                     18

12       PLF'S:        3                     22

13       PLF'S:        4                     23

14       PLF'S:        5                     29

15       PLF'S:        6                     32

16

17                  INFORMATION REQUESTED

18                    NOT APPLICABLE

19

20               *     *     *     *     *

21

22

23

24

25

1    <u>APPEARANCES</u>

2    ON BEHALF OF PLAINTIFF

3         Mr. Gregory Mansell
          Attorney at Law
4         Mansell Law, LLC
          1457 South High Street
5         Columbus, Ohio 43207

6
          Mr. Peter Friedmann
7         Attorney at Law
          The Friedmann Firm
8         1457 South High Street
          Columbus, Ohio 43207
9

10
     ON BEHALF OF DEFENDANTS
11
          Mr. Gary Winters
12        Attorney at Law
          McCaslin, Imbus & McCaslin
13        632 Vine Street
          Suite 900
14        Cincinnati, Ohio 45202

15

16                   *    *    *    *    *

17

18

19

20

21

22

23

24

25

1    WHEREUPON:

2                         WALTER RODGERS,

3    of lawful age, a witness herein, being first duly

4    sworn as hereinafter certified, testified as

5    follows:

6                        CROSS-EXAMINATION

7    BY MR. MANSELL:

8          Q.   Mr. Rodgers, will you please state

9    your full name for the record?

10         A.   Walter I. Rodgers, Jr.

11         Q.   And, Mr. Rodgers, have you ever had

12   your deposition taken before?

13         A.   Yes.

14         Q.   And what was that in relation to?

15         A.   My deposition was taken in a case in

16   the mid-80s where I used to work in Florida.

17         Q.   Is that in your role as human

18   resources?

19         A.   No.  Back then I was an operations

20   manager for the company I worked for there.

21         Q.   Did you, you said you had your

22   deposition taken.  Was that an employment case or

23   was it some other issue?

24         A.   It was a harassment case.

25         Q.   And were the allegations against you?

1              A.   No.   The allegations were against an

2       employee of the company.

3              Q.   All right.   Well, it's been quite some

4       time since you've had your deposition taken so I'm

5       going to go over some ground rules with you so we

6       make sure the court reporter is able to take

7       everything down accurately.   She is taking

8       everything down that we're saying, so it's

9       important that we try not to talk over each other.

10      Even if you know where I'm going with the question,

11      let me finish before you give a response.

12                   If at any point I cut you off with

13      an answer and you want to add something to it, just

14      let me know and I would be more than happy to let

15      you do that, but I just want to make sure the

16      record is clear, and so we don't both talk at the

17      same time and make it difficult for her to take

18      down everything.   Is that fair?

19             A.   Yes, that's fair.

20             Q.   All right.   And you're doing a good job

21      so far, but try to give verbal answers.   Nods of

22      the heads or uh-huh, huh-uhs are hard for her to

23      take down.   So yeses, noes, or a full verbal

24      answers will be helpful.   Is that fair?

25             A.   That is fair.

1      Q.   All right.  And if at any time you want
2   a break, just let me know.  All that I ask is that
3   if there's a question pending, we answer that
4   before going on break.  Does that work?
5      A.   Yes, that works.
6      Q.   All right.  Is there any, are you on
7   any medications today that would prevent you from
8   recalling facts truthfully or accurately?
9      A.   No.
10      Q.   Any other reason you would not be able
11   to truthfully or accurately recall any facts?
12      A.   No.
13      Q.   Did you prepare for today's deposition?
14      A.   No.
15      Q.   Did you review any documents before
16   coming to today's deposition?
17      A.   No, I did not.
18      Q.   Did you review any e-mails?
19      A.   No.
20      Q.   What is your current position?
21      A.   Vice-president of human resources for
22   RelaDyne, LLC.
23      Q.   All right.  When did you start in that
24   position?
25      A.   I started in January of 2011.

1          Q.   And what was your position prior to

2     January 2011?

3          A.   I worked for a company called Ferguson

4     Enterprises out of Newport News, Virginia.  When I

5     resigned my position, I was the director of talent

6     development in the human resources department.

7          Q.   And have you been in the role of

8     vice-president of human resources since you started

9     in January 2011 with RelaDyne?

10         A.   I have.

11         Q.   And tell me about your job duties as

12    vice-president?

13         A.   Okay.  In my role, it is my

14    responsibility to lay down the culture of the

15    company and the definition of culture, that is to

16    articulate to our management team and all of our

17    associates how we go to market, both internally and

18    externally.

19              I am also responsible as a

20    component of the culture for the benefits package

21    that our associates are able to participate in.  In

22    regards to the benefits, I'm referring to medical

23    care, ancillary insurance, retirement plans, that

24    sort of thing.

25              In human resources, we also manage

1      all the payroll for the company and the development

2      of talent.  So in that last part, I work closely

3      with the, we call them profit centers, but the

4      general managers that manage areas for us and their

5      teams so that they, you know, get the training and

6      the development they need to do the same with their

7      teams.  So that's a little bit of what we're all

8      about in human resources.

9           Q.  Do you participate in the hiring or

10     firing of employees?

11          A.  I only participate in hiring of certain

12     roles.  So maybe I'll explain that to you a little

13     better.  We are relatively decentralized for 600 or

14     so associates.  We have 20 people in, what you

15     would call, headquarters.  We call it our support

16     center, which the way that works is the, we have

17     general managers that manage in the field for a

18     market, and you'll meet Mr. Downs, if you've not

19     met him already.  He's responsible for the Ohio

20     Valley market.

21               And in regards to hiring, I am

22     generally only involved in the key management roles

23     in his and other markets, so that would be his

24     position or operations or credit, and same thing in

25     regards to termination.  My role, if there was

1    some, and when someone would be terminated would be

2    to consult.

3                      But the local offices have been

4    trained on the process and they manage it

5    internally with the exception of those roles I

6    mentioned to you.

7         Q.   Did you make the final decision to

8    terminate Mr. Lankford?

9         A.   I don't know if I made the final

10   decision.  I consulted on terminating Mr. Lankford.

11        Q.   With who?

12        A.   I believe Mr. Downs.  I don't remember

13   exactly.  It might have been Mr. Luke because I've

14   not seen e-mails, but one of the two of them.

15        Q.   So would that be part of your role as

16   human resources to make the decision to fire an

17   employee in Mr. Lankford's position?

18        A.   You know, what I would say is I

19   generally don't get involved.  I have in the past.

20   Mr. Lankford was a territory sales representative

21   for us.  That was his last role.  I generally only

22   get involved when there is a special circumstance

23   to terminate.

24                      So I would consider what occurred

25   in this case a special circumstance, and the

1    operations team led by Mr. Downs, they chose to

2    consult with me and that's what we asked them to do

3    when there's special circumstances.  For example, a

4    violation of a policy that's written in a handbook,

5    that would be a special circumstance.

6              Q.  Do you remember why Mr. Lankford's

7    situation was a special circumstance?

8              A.  Yes.

9              Q.  Why is that?

10             A.  He violated a policy in our handbook

11   directly.

12             Q.  It had nothing to do with the fact that

13   he was also out of the office on FMLA and they

14   wanted to consult with you to make sure they were

15   doing everything appropriately?

16             A.  No, nothing to do with that.

17             Q.  So it was strictly a special

18   circumstance because there was a policy, handbook

19   policy involved?

20             A.  Correct.

21             Q.  And you don't specifically remember if

22   you were just consulted with or if you played a

23   more direct role in the decision to terminate Mr.

24   Lankford as you sit here?

25             A.  I don't specifically remember.  When

1    you say a direct role, I don't know what that

2    means.

3              Q.   Well, if they came to you and said,

4    Tony Downs calls you and says, hey, I got this

5    situation.  What do you think?  And you say, yeah,

6    you got to fire this guy, and Tony Downs says,

7    okay.  That would be, to me, you making the

8    decision to terminate.

9              A.   Okay.

10             Q.   If Mr. Downs calls and says, I want to

11   fire this guy and you say, okay, let me review it.

12   And you go, okay, yeah.  I see what you're saying

13   here.  Go ahead.  Then that would be more of a

14   consulting role.

15             A.   What I recall is that, and, again, I

16   don't remember if it came from Tony or David Luke,

17   but one of them had laid out in an e-mail, or

18   series of e-mails, the situation and what had

19   occurred and had requested from me, again,

20   consultation.  You know, they said we would like to

21   terminate him on this.  Is that appropriate?  I

22   read the facts, looked at the situation, went back

23   to the handbook, looked it up again, and from what

24   I recall, I even told them, yes, you're clear to

25   proceed.  This is a violation of this component in

1       the handbook.  I'm relatively certain that's

2       somewhere in an e-mail.

3               Q.  We'll look at e-mails.  To whom do you

4       report?

5               A.  Larry Stoddard, chief executive

6       officer.

7               Q.  How many employees are there in the

8       human resources department?

9               A.  Well, the way we're structured in the

10      support center, there are two of us, myself and an

11      HR generalist.  In each of the main profit centers,

12      of which we have six currently, there is one human

13      resources coordinator.  So Mr. Downs' group has a

14      human resources coordinator.

15              Q.  Who is that?  Do you know?

16              A.  Well, at, currently, the gentleman's

17      name is Ben Scruby.  He's currently in the role.

18      Scruby, S-C-R-U-B-Y.

19              Q.  Who was in the role during Mr.

20      Lankford --

21              A.  However, during this occurrence was

22      Chris Chaille, C-H-A-I-L-L-E.

23              Q.  Okay.  And who was the HR generalist at

24      that time?

25              A.  We didn't have one.  Are you referring

1    to, at the support center, right?

2         Q.   Yes.  You said there's two of you in

3    the support center; you and the HR generalist?

4         A.   At that time, well, the generalist was

5    hired August of last year.

6         Q.   Where is the support center?  Where is

7    your office?

8         A.   Blue Ash, Ohio.

9         Q.   And does Mr. Downs have an office?

10        A.   He does at the profit center, the

11   branch on River Road in Cincinnati.

12        Q.   Does Mr. Downs, I'm sorry, does

13   Mr. Luke have an office?

14        A.   He does with Mr. Downs in Cincinnati.

15        Q.   Is Mr. Luke associated at all with

16   human resources?

17        A.   Mr. Luke is the director of safety and

18   risk so he does not answer to me.

19        Q.   If there's an issue with an employee,

20   does human resources do an investigation?  Who

21   would do an investigation if there was a complaint

22   about an employee or from an employee?

23        A.   Depending on the nature of the

24   complaint, so, typically, if it's a

25   harassment-related sort of thing, then the human

1   resources coordinator in the local branch would

2   manage it and they might consult with us at the

3   support center on how to handle the process and

4   that sort of thing.

5                    If it is something more like what

6   has occurred in this case with Mr. Lankford where

7   there is this type of violation, and it could be

8   any number of things.  In the past we've had things

9   that included theft or other, based on the type of

10  products that we sell, other issues.  Those

11  generally are investigated by the safety and risk

12  group.

13                    So Mr. Luke has a counterpart he

14  works with who manages the southern half of the

15  country and Mr. Luke manages the northern half for

16  that department.

17           Q.   So in Mr. Lankford's termination you

18  didn't actively participate in the investigation.

19  Is that fair to say?

20           A.   That's fair to say.

21           Q.   So it was done by Mr. Luke, as far as

22  you know?

23           A.   As far as I know.

24           Q.   Let me hand you, let me have it back to

25  put a sticker on it.

```
1              (WHEREUPON, Plaintiff's Exhibit 1
2      was marked for identification.)
3      BY MR. MANSELL:
4              Q.  Let me hand you what's been marked as
5      Plaintiff's Exhibit 1.
6              A.  Would you like me to look through it?
7              Q.  Yes, please.  It should be nine pages.
8              A.  Okay.  (Witness complies with request.)
9              Q.  All right.  What is this document?
10             A.  This is the Family Medical and Leave
11     Act form that is filled out when someone needs to
12     leave the company, requested leave that is
13     protected under this law.
14                  They fill the form out and
15     underneath, at the bottom of the form next to my
16     signature, C.C., that's Chris Chaille that I
17     referred to.  She, in her role, is responsible for,
18     and the other HR coordinators are responsible for
19     making sure that when someone goes out in the, for
20     the appropriate, if it's a certain amount of days
21     and they're going to be longer than a certain
22     number of days, that the right processes are
23     followed to protect them per the Family Medical
24     Leave Act.
25             Q.  So the first page of this document is a
```

1     cover letter?

2          A.   Correct.

3          Q.   And the remainder of it is Document 70

4     to be filled out by the employee for portions and

5     portions by the employer, right?

6          A.   Yes.

7          Q.   Did you actually send this to

8     Mr. Lankford yourself or is this something that you

9     didn't see and actually Chris Chaille sent it out?

10         A.   This is a form that we provide in a

11    process on our intranet for our coordinators.

12    Chris went out and found it.  I don't recall if she

13    consulted with me on how to fill it out.  We also

14    have a broker that manages this with us, and she

15    grabbed it, signed it on my behalf, and sent it to

16    Mr. Lankford.

17         Q.   Do you recall becoming aware, at that

18    time in January 29th, 2014, that Mr. Lankford

19    needed a leave of absence for a medical reason?

20         A.   I do recall being made aware.

21         Q.   And do you recall being made aware

22    from, is Chris female or male?

23         A.   She's a female.

24         Q.   Do you recall becoming aware from Chris

25    Chaille?

1          A.   I believe so, but to be very honest, I

2     don't recall if Mr. Lankford called me himself and

3     said, what do I do?  Sometimes that happens, and I

4     say, well, to protect you, here's what we need to

5     do and here's how we do it.  And so, I apologize.

6     I just don't recall exactly --

7          Q.   Understood.  Would this be mailed out

8     or e-mailed?

9          A.   What we prefer in these cases of FMLA

10     is to have the associate come to the office and

11     have the HR coordinator walk them through the

12     paperwork.  I prefer not, something, because of the

13     complexity of this situation, we prefer that it not

14     be e-mailed.

15               Now, did she e-mail it, that may

16     have been a conversation she had with Paul

17     Lankford.  I don't know.  But you can see, as you

18     read this document, that it's complex and there's a

19     lot to it.  And because of that, we prefer that it

20     be handled face-to-face.

21          Q.   If you look at the third page, the

22     final paragraph before the paper reduction act

23     notice, the last sentence says, if you have any

24     questions, please do not hesitate to contact Walt

25     Rodgers, (513) 489-6000.  Is that your phone

1    number?

2           A.   That is our office number, yeah, at the

3    support center.

4           Q.   What is your fax number at the support

5    center?

6           A.   I believe it's 0401.  Yeah.  489-0401.

7                    (WHEREUPON, Plaintiff's Exhibit 2

8    was marked for identification.)

9    BY MR. MANSELL:

10          Q.   I'm going to hand you what's been

11   marked as Plaintiff's Exhibit 2.

12          A.   Okay.  (Witness reviews document.)

13          Q.   And you've seen this document before?

14          A.   I don't recall seeing this, no.

15          Q.   The first page looks like a fax cover

16   sheet.  Agreed?

17          A.   It does, yes.

18          Q.   It says, to Walt Rodgers, then the fax

19   number (513) 489-0401.  Do you see that?

20          A.   I see it, yes.

21          Q.   And that is your fax number, correct?

22          A.   Yes.

23          Q.   If you look at the stamp at the top, it

24   says January 31st, 2014.  Do you see that?

25          A.   I mean, I would submit that it was

1    faxed, it appears, to our office.  Generally, what
2    happens is it gets turned right around and sent to
3    the local HR coordinator.
4              Q.  So who would have done that at that
5    time?
6              A.  It could have been, at that time
7    January of' 14, it could have been our
8    administrative assistant.
9              Q.  This wouldn't go to you at all or you
10   just don't recall?
11             A.  I don't recall it.  It may have gone to
12   me, but, like I said, when things come to me like
13   this and the whole paperwork flow is kept and
14   managed in the branch, at that time, it was managed
15   locally.  I would have done nothing more than
16   perused it, and, oh, it looks legitimate and sent
17   it.
18             Q.  So you would review it to make sure
19   there isn't some issue with the certification where
20   you would want to have some follow up or have a
21   second opinion or something like that?
22             A.  I wouldn't even necessarily do that.
23             Q.  Whose responsibility would that be?
24             A.  That would be the coordinator's
25   responsibility.  Now, we've changed the process a

1    little with the hiring of the generalist.  The

2    generalist works closer with the coordinator, but,

3    at the time, we did not have that process in place.

4    We kept, you know, and the coordinator consults

5    with our broker on the FMLA process.

6              Q.  If there was an issue with the

7    certification, would that be something that you

8    would want the HR coordinator to consult with you

9    on?

10             A.  When you say certification, I want to

11   understand what you mean?

12             Q.  The certification that was faxed, these

13   FMLA forms are certifying that Mr. Lankford needs

14   leave for a serious medical condition by a medical

15   provider.

16             A.  Okay.  So if there was a problem with

17   the form, is that your question?  If there's a

18   problem with the form, would I want them to consult

19   with me?

20             Q.  Yes.

21             A.  It depends on the nature of the

22   problem.  I could say generally, yes.  However, if

23   the issue is, if it requires in-depth analysis, we

24   would go to our specialist for that and that is

25   through our broker.

1          Q.  Do you remember if Mr. Lankford's

2     request for leave was approved?

3          A.  I do remember that it was approved.

4          Q.  There was no issues with Mr. Lankford's

5     leave or his certification?

6          A.  None that I recall, no.  This is the

7     2014 when he left to go to Florida, correct?  Is

8     that what you're referring to?

9          Q.  That's correct.  If you look through

10    these documents --

11         A.  Which one?

12         Q.  Exhibit 2.  Go to Page 3.

13         A.  And he was gone a month or so, and he

14    was in Florida, right?  And I recall that was

15    approved.

16         Q.  Do you recall reviewing the portion of

17    this document that states the reason why Mr.

18    Lankford needed leave?  Page 3 and 4 of the

19    document go into detail --

20         A.  I don't recall specifically reviewing

21    this document, but I do recall hearing that Mr.

22    Lankford had checked himself into a facility for

23    substance abuse.  I recall that.

24         Q.  Are you aware of any policy that was in

25    place at the time that RelaDyne had that said, if

1    anybody, any employee for any reason has a

2    substance abuse issue, we're going to terminate

3    them?

4         A.   No such policy.

5              (WHEREUPON, Plaintiff's Exhibit 3

6    was marked for identification.)

7    BY MR. MANSELL:

8         Q.   I'll hand you what's been marked as

9    Plaintiff's Exhibit 3.

10        A.   Okay.

11        Q.   I handed you two copies.  Would you

12   mind giving one to your counsel?

13        A.   Because this is an e-mail string, I'm

14   going to read it from the bottom up.

15        Q.   All right.  Now, this is an e-mail

16   thread with multiple individuals and some are on it

17   and some drop off, and the third e-mail is when

18   you're actually added, if you see that, which is

19   the second e-mail down on the page.  But in timing

20   chronologically --

21        A.   From Mr. Oehler?

22        Q.   Yes.

23        A.   Got it.

24        Q.   Do you recall receiving this e-mail

25   from Mr. Oehler?

1          A.   I do not recall this particular e-mail.

2          Q.   All right.  If you look at the e-mail,

3     which would have been part of the thread that Mr.

4     Oehler copied you on that is from Tony Downs to Dan

5     and Doug Oehler dated February 4th, 2014 at 8:57

6     a.m., Mr. Downs talks about Mr. Lankford being

7     checked into rehab.

8                    Do you see that?

9          A.   I do.

10         Q.   Do you believe this is when you first

11    found out about Mr. Lankford being checked into

12    rehab?

13         A.   You know, I believe I was aware earlier

14    because of the FMLA request.  I don't believe this

15    is when I first found out.

16                    (WHEREUPON, Plaintiff's Exhibit 4

17    was marked for identification.)

18    BY MR. MANSELL:

19         Q.   I'm going to hand you what's been

20    marked as Plaintiff's Exhibit 4.

21         A.   Okay.

22         Q.   And while you're looking, I'll just put

23    on the record that the e-mail from Tony Downs

24    describing Mr. Lankford being checked into rehab is

25    the beginning of this e-mail thread, as well, and

1    then it goes off in a little bit different

2    direction.

3              A.   Okay.

4              Q.   And on Page 2, like I said, Mr. Downs

5    sends the e-mail, and not the next e-mail in the

6    chain but the e-mail after that was from you to Dan

7    Oehler that I assume is responding to the Tony

8    Downs's e-mail about Mr. Lankford being checked

9    into rehab, and you say, Jesus.

10                  Do you see that?

11             A.   I do.

12             Q.   Is that a response to Mr. Downs'

13   e-mail?

14             A.   I would say.

15                  MR. WINTERS:   Mr. Downs' e-mail

16   has a lot of stuff in it so if you're asking what

17   specific response, I think that puts a more

18   specific question.

19   BY MR. MANSELL:

20             Q.   Well, you're not saying, Jesus, in

21   response to Dan Oehler saying, I will be in a

22   meeting in Toledo Friday afternoon, are you?

23             A.   No.

24             Q.   So it might be something specific in

25   Mr. Downs' e-mail, but that is a response to

1     Mr. Downs' e-mail, right?

2             A.   I would say yes to that.

3             Q.   Okay.  Do you recall why you were

4     saying, Jesus?

5             A.   I think, at the time, my thoughts were,

6     for one, I hate to see anyone go through what Mr.

7     Lankford has clearly gone through, and it seems

8     like, to me, a big mess for him and the company.

9     There's a lot in here.  Whenever there's a

10    distraction in our businesses, I have concern for

11    the associate involved, and I have concern for the

12    business and the impact of the business.  I am

13    certain that that one word, Jesus, was used to

14    describe my concern for all of the above.

15            Q.   All right.  Then Mr. Oehler responds to

16    you and says, second time.  Do you see that?

17            A.   I did see that.

18            Q.   And then you respond saying, rehab

19    twice?  Do you see that?

20            A.   I see it, yes.

21            Q.   Okay.  So those two e-mails are

22    directly related to the rehab?

23            A.   I would say they are.

24            Q.   All right.  And did you, Mr. Oehler

25    then responds and says, this is the second, and

1     that's the end of the e-mail thread.  Did you have

2     a conversation with Mr. Oehler that day?

3               A.   I don't remember one.

4               Q.   Did you have one shortly after this?

5               A.   I think either Dan or his brother,

6     Doug, told me that Mr. Lankford had another

7     occurrence of this situation of rehab several years

8     prior, perhaps long before the RelaDyne acquisition

9     of Oil Distributing Company.

10              Q.   And that's not reflected in this e-mail

11    that, the level of detail that you're saying,

12    right?

13              A.   Right.  It was verbal.  I didn't know

14    about the second, that he had been twice.  It made

15    me even more concerned for him.

16              Q.   Was it around this time that you had

17    that conversation with Dan or Doug?

18              A.   I think it was not long after this

19    e-mail.  I don't remember exactly.

20              Q.   But you certainly didn't know prior to

21    this e-mail, correct?

22              A.   I did not.

23              Q.   All right.  So you think either

24    sometime during this day or shortly after that

25    conversation occurred?

1           A.   I think so.

2           Q.   Okay.  Who was on that call, just you

3     and Dan or Doug, or was it a conference call with

4     multiple people?  Do you know?

5           A.   I think it was just me and one of the

6     two of them.

7           Q.   Do you remember any other details of

8     that conversation, how that came up or anything?

9           A.   I asked about it.  I asked him to tell

10    me more details, and he said that it was a similar

11    situation to this one and that Mr. Lankford had

12    asked for time off to deal with an abuse issue,

13    which they allowed him, and it had been quite

14    awhile since it had occurred.

15          Q.   Do you remember having a conversation

16    with Mr. Downs about the situation involving Mr.

17    Lankford's rehab?

18          A.   I feel like I did, but I don't recall

19    specifically other than explaining, perhaps, the

20    process of, generally, when these things happen, I

21    help the general managers understand the process

22    with the associate and how to work with them to

23    allow them to get better.

24          Q.   Do you recall having a conversation

25    with anybody else on February 4th or shortly after

1      about Mr. Lankford's substance abuse or rehab?

2             A.   I don't.   Looking at the date on the

3      treatment center, I don't believe they would have

4      called me.   I don't recall any other conversations

5      I had.

6             Q.   Did you communicate with Mr. Luke

7      during this time period?

8             A.   Which time period are you talking

9      about?

10            Q.   This February 4th time period, any time

11     after you received the e-mail from Dan Oehler

12     forwarding the e-mail about Tony Downs?

13            A.   I don't recall communicating with

14     Mr. Luke about, around the 4th of February about

15     Mr. Lankford's rehab.

16            Q.   All right.   What was your understanding

17     of the reason Mr. Lankford was terminated?

18            A.   My understanding is that Mr. Lankford

19     violated a company policy in the misappropriation

20     of, I want to say, product, for lack of a better

21     term, that was given for a certain use to promote

22     the company for charitable purposes, and in

23     violation of our policy, he was terminated.

24            Q.   Do you recall how you first became

25     aware of that; an e-mail or a phone call?

1      A.   I believe either Mr. Luke or Mr. Downs

2  called me to say there was going to be an e-mail

3  that explained in more depth the situation and

4  asked that I review it and give them, consult with

5  them as to my opinion on the next steps.

6                  (WHEREUPON, Plaintiff's Exhibit 5

7  was marked for identification.)

8  BY MR. MANSELL:

9      Q.   I've handed you what's been marked as

10 Plaintiff's Exhibit 5.

11     A.   Okay.  (Witness reviews document.)

12 Okay.

13     Q.   All right.  And if we look at the

14 second and third pages of Plaintiff's 5, is this

15 the report that you received from Mr. Luke about

16 the misappropriation of product?

17     A.   I believe it is.

18     Q.   Okay.  And you didn't do any of this

19 investigation?

20     A.   No.

21     Q.   And you didn't interview any of the

22 individuals here that are stated in this report?

23     A.   No.

24     Q.   And you were relying on Mr. Luke to do

25 a full and fair investigation when you were

1    reviewing this, correct?

2         A.  Yes, and I reviewed this.  It appeared

3    to me to be very complete and very thorough.

4         Q.  But you had no way to verify the

5    accuracy of the statements in here, did you?

6         A.  Well, I could have verified, had I done

7    my own investigation, but that was not our process.

8         Q.  Right.  But you had no way reading this

9    to verify the accuracy of the statements contained

10   in the report?

11        A.  I didn't feel it was necessary to

12   verify them.  Our process is for the director of

13   safety and risk to do an investigation, sum it up

14   in very factual form, which Mr. Luke has done.

15        Q.  So you're relying on Mr. Luke to put in

16   truthful statements in here?

17        A.  Absolutely.

18        Q.  All right.  It appears that you were

19   forwarded this by Dan Oehler on February 5th, 2014

20   at 10:50 p.m.  Do you see that?

21        A.  I see it.

22        Q.  And it says, Dan Oehler says, Walt,

23   Tony may have sent you this, or this to you also,

24   but I want to make sure that you have, as well.

25   Did I read that correctly?

1          A.   Yes.

2          Q.   And do you recall if you received this

3     from Tony prior?

4          A.   I don't recall if I got it from Tony

5     first.

6          Q.   If you did, it would be in an e-mail?

7          A.   More than likely, yeah.

8          Q.   Then the second sentence says, I

9     discussed with Tony today my thoughts, but we need

10     to consult with you regarding his rehab condition.

11               Do you see that?

12          A.   I do see that.

13          Q.   Okay.  Do you recall consulting with

14     Dan Oehler or Tony Downs regarding Mr. Lankford's

15     rehab condition?

16          A.   Only what I've already mentioned to you

17     about the process of FMLA and managing through, for

18     Mr. Lankford and for the business.  So that's all I

19     discussed in regards to his rehab.

20          Q.   You don't remember any independent

21     consultation with Mr. Downs or Mr. Oehler regarding

22     his rehab condition other than what you've told us

23     already?

24          A.   No.  However, it would not have been

25     out of character for me in summary of the situation

1     to make sure they understood that if there was a

2     reason to terminate an associate that was

3     independent of any other event that happened to be

4     occurring with the associate in this case, I'm

5     assuming from the timing standpoint it was rehab,

6     that the associate would have to be back to work

7     and completely healed and doing their thing.  I

8     don't recall if I had that specific conversation

9     with Mr. Downs, but that is our process.

10                    (WHEREUPON, Plaintiff's Exhibit 6

11    was marked for identification.)

12    BY MR. MANSELL:

13         Q.  I'm going to hand you what's been

14    marked as Plaintiff's 6.

15                    MR. WINTERS:  Do you have one of

16    these for me?

17                    MR. MANSELL:  That's what I'm

18    looking for.  I don't know why I only have two of

19    this one.

20    BY MR. MANSELL:

21         Q.  All right.

22         A.  Can I have a minute?  I just want to

23    look at something.  Is that okay?

24         Q.  Sure.  Yeah.

25         A.  Okay.

1          Q.  All right.  Exhibit 6 is a continuation

2     of the e-mail thread from Exhibit 5, correct?

3          A.  Yes.

4          Q.  Okay.  And you have your response there

5     at the bottom of Page 1 where you state, wow,

6     correct?

7          A.  Correct.

8          Q.  And then there's some back and forth

9     between you and Mr. Oehler, and then the final

10     e-mail from Mr. Oehler at the top dated February

11     5th, 2014 at 11:10 p.m.  It states, Toledo got

12     cancelled.  See you Friday.  Tony just needs help

13     on an exit strategy.  Do you see that?

14          A.  I see it.

15          Q.  Okay.  And was it your understanding,

16     at this point, that the decision to terminate Mr.

17     Lankford had been made and that you were just to

18     help Tony on an exit strategy?

19          A.  What I understood, and I don't recall

20     having the conversation with Mr. Oehler about what

21     he wrote, but what I understood was my role then

22     was to help Tony summarize what had occurred to

23     that point and what we could or could not or should

24     not or should do from that point.

25               I don't know if what Dan Oehler is

1      referring to is necessarily exit strategy, meaning
2      Mr. Lankford's employment, or if he's referring to
3      something else with the FMLA.  I don't recall what
4      he meant there.  You would have to ask him that.
5             Q.   Who is Ann Boeckermann?
6             A.   Ann is a corporate controller.  It's
7      Boeckermann.  She's a corporate controller.  At the
8      time, she was in a dual role as the Cincinnati
9      profit center controller, finance department
10     manager, and the corporate controller role.  So she
11     was answering directly to Mr. Downs at the time.
12            Q.   Do you know of any role she would play
13     in firing employees?
14            A.   When she was working for Mr. Downs, one
15     of her responsibilities was payroll.  In directly
16     answering your question, I suspect her primary role
17     would have been, or one of her primary roles would
18     have been, in the event of a termination, paying
19     out final moneys due, for example, unused vacation
20     or commissions earned, that sort of thing.
21            Q.   But you're not aware of any
22     investigatory or human resources role she was
23     playing at that time?
24            A.   For this particular case, no, I'm not
25     aware of it.

1          Q.  You never consulted with her regarding

2     Mr. Lankford, did you?

3          A.  I don't recall consulting with her.

4          Q.  All right.  Now, after Exhibit 6, the

5     e-mail from Dan Oehler, do you recall having

6     conversations or any correspondence with Mr. Downs

7     about how to proceed with termination?

8          A.  I recall after reading Mr. Luke's

9     report, I recall an e-mail where I consulted with

10    Mr. Downs, either directly or through Mr. Luke,

11    saying that, based on the facts of the situation,

12    there was a violation of our company policy that

13    could lead directly to termination.  I do recall

14    that.

15         Q.  And were you present at the termination

16    meeting with Mr. Lankford and Mr. Downs?

17         A.  No.

18         Q.  Do you know who was?

19         A.  I think it was Luke, Downs, and

20    Lankford, but I'm not sure.

21         Q.  So after you got the report from, that

22    originated from David Luke, you looked at the

23    employee handbook; is that fair?

24         A.  That's fair.

25         Q.  And then that's when you sent the

1    e-mail stating this is grounds for termination

2    under this policy and provision?

3            A.   Essentially.  I don't remember how I

4    said it, but that's the --

5            Q.   I'm paraphrasing.  Sure.

6            A.   I understand.

7            Q.   And what else, what other participation

8    did you have in the termination process, if you

9    recall anything else?

10           A.   I really don't recall anything, any

11   other involvement at that point.

12           Q.   Did Mr. Downs tell you that he wanted

13   to terminate Mr. Lankford?

14           A.   I don't recall Mr. Downs telling me

15   that he wanted to terminate.  What I recall is

16   either Mr. Luke or Mr. Downs asking me the proper

17   protocol in response to the severity of the

18   offense.  That's what I recall.

19           Q.   Did you decide that the report from

20   David Luke required that Mr. Lankford be terminated

21   or was that a decision that somebody else made?

22           A.    When they consulted with me, and I

23   don't recall exactly how I worded it, but the

24   spirit of my thoughts, if that's the appropriate

25   way to say it, were that the offense was

1          significant enough that the proper course of action

2          was termination in consistency with our policies.

3                  Q.   And whether to actually go through with

4          the termination was a decision that Mr. Downs or

5          Mr. Luke or somebody else made or were you saying

6          this has to be done?  And I guess what I'm trying

7          to figure out is if you give your opinion as VP of

8          HR that, hey, here's how I read that report and

9          that could be grounds for termination, you guys

10         decide, or are you saying, I read that report, we

11         need to terminate?

12                 A.   I don't remember what I said.  But had

13         that report hit my desk today, I can tell you, I

14         would say I read that report.  My consult is to

15         terminate, and I would also say, if you don't

16         terminate, there are other actions that you'll have

17         to take with the employee.

18                 Q.   Such as what?

19                 A.   Depends on the offense.  But if it's

20         similar to this one, it would have to be a series

21         of counseling and, to be honest, every time this

22         event occurs, this type of event, which is right up

23         there with theft, we go straight to terminate.

24                 Q.   This has occurred before?

25                 A.   Not this exact thing, no, but we've had

1          theft before in our company, not with Mr. Lankford.

2                    Q.   Have you had misappropriation of

3          product before?

4                    A.   Not that I recall.

5                    Q.   So what were the theft situations?  Do

6          you recall any specifics?

7                    A.   We've had a variety of things where

8          sales reps took samples that were intended to be

9          used for the promotion of the business and use them

10         for other things.  We've had drivers that have sold

11         fuel.

12                   Q.   Let's talk about the sales reps that

13         have taken for themselves samples they were

14         supposed to give away to customers or the

15         development of the business.  What happened, was

16         that multiple sales reps or one sales rep?

17                   A.   That wasn't in RelaDyne.  That was in

18         Ferguson, but I've experienced it.

19                   Q.   So that has not happened at RelaDyne?

20                   A.   Correct.  You're asking, specifically,

21         only RelaDyne?

22                   Q.   Correct.

23                   A.   If you isolate it to what I'm

24         considering the severity of the situation, so I'm

25         saying that what Mr. Lankford did is severe and on

1      par with theft.  We've had theft in RelaDyne.  We

2      dealt with it the same way.

3                       One of the examples of theft is we

4      had a driver that took product for personal use as

5      opposed to delivering it to --

6              Q.   Did he sell it?

7              A.   No.  He consumed it himself, fuel.

8              Q.   So he would siphon it out of his truck

9      into his own car or something like that?

10             A.   Essentially.  And to barrels, but it's

11     the same thing and use it.

12             Q.   Who was that individual?

13             A.   I don't recall his name, but I know he

14     worked in Houston, Texas.

15             Q.   And he was just a delivery driver for

16     RelaDyne?

17             A.   He, I believe he was a delivery driver.

18     I would have to look up the case there to know

19     exactly his title.  He could have been a fueling

20     services driver.  He could have been a --

21                  MR. WINTERS:  Don't guess, please.

22                  THE WITNESS:  I really don't know.

23                  MR. MANSELL:  Excuse me?

24                  MR. WINTERS:  I asked him not to

25     guess.

1    BY MR. MANSELL:

2         Q.   All right.  So any other instances of

3    theft other than this unnamed driver or unnamed

4    individual that was putting fuel in barrels while

5    you were at RelaDyne?

6         A.   I would have to look them up because I

7    don't recall the exact details.  Generally, those

8    are managed locally.

9         Q.   Would you have access to look those up?

10        A.   More than likely I could make some

11   inquiries and find out, yes.

12        Q.   Have you done so already in this case

13   or --

14        A.   I have not, no.

15        Q.   If there was a situation involving a

16   sales rep taking product, is that something you

17   would become aware of or be able to find out in

18   your role?

19        A.   Yes.  It would be normal for me to be

20   made aware of that.

21        Q.   And do you recall being made aware of

22   that, a sales rep taking samples or using product

23   for his own personal use?

24        A.   At RelaDyne?

25        Q.   Yes.

1          A.   Just Mr. Lankford.

2                    MR. WINTERS:  Are you getting

3     close to wrapping up?

4                    MR. MANSELL:  Yeah.  Why don't you

5     give me a second.

6                    (WHEREUPON, a recess was taken.)

7                    MR. MANSELL:  All right.  I have

8     nothing further.

9                    MR. WINTERS:  I have no questions.

10    We will have signature.

11                   (WHEREUPON, the deposition

12    concluded at 11:34 a.m.)

13

14          *     *     *     *     *

15

16

17    _____
                              WALTER RODGERS

18

19

20

21

22

23

24

25

1            C E R T I F I C A T E

2

3      STATE OF OHIO
                        SS.
4      COUNTY OF MONTGOMERY

5

6            I, Lainey Fergueson, the undersigned, a
       Certified Shorthand Reporter, and Notary Public
7      within and for the State of Ohio, do hereby certify
       that before the giving of aforesaid deposition said
8      WALTER RODGERS, was by me first duly sworn to state
       the truth, the whole truth, and nothing but the
9      truth; that the foregoing is the deposition given
       at said time and place by said WALTER RODGERS; that
10     said deposition was taken in stenotypy by the court
       reporter and transcribed into typewriting under her
11     supervision; that said transcribed deposition was
       submitted to the witness for his examination; the
12     court reporter was neither a relative of nor
       attorney for any of the parties to this case nor
13     relative of nor employee for any of the counsel;
       neither the court reporter nor the affiliated court
14     reporting firm has a financial interest under a
       contract as defined in Civil Rule 28(D).

15

            IN WITNESS WHEREOF, I hereunto set my
16     hand and official seal of office this 31st day of
       August, 2015.

17

18

19     _____
                              LAINEY FERGUESON, CSR
20                            Notary Public, State of Ohio
                              My Commission Expires 12-24-18
21

22

23

24

25

1    PLEASE USE THIS ERRATA SHEET TO MAKE ANY
AND ALL CORRECTIONS, BY LISTING THE PAGE NUMBER,
2    LINE NUMBER AND THEN A BRIEF DESCRIPTION OF THE
ERROR.  PLEASE DO NOT MAKE ANY MARKS OR CORRECTIONS
3    ON THE TRANSCRIPT.  IF NEEDED USE THE BACK OF THIS
SHEET.  UPON COMPLETION PLEASE SIGN AND DATE THIS
4    SHEET AT THE BOTTOM.  THANK YOU.

5    _____
_____
6    _____
7    _____
8    _____
9    _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
20   _____
21   _____
22   _____
23   _____
24   SIGNATURE:_____DATE:_____

25



**RelaDyne**
*Reliability in Motion*

Date:    January 29, 2014

To:    PAUL LANKFORD

From:    Walt Rodgers / Human Resources

Re:    Request/Need for Family/Medical Leave

Dear Paul,

On (date), RelaDyne LLC became aware that you might have a condition / situation, which would qualify you for leave under the Family and Medical Leave Act (FMLA). This letter is to inform you that the company has approved your request for leave, contingent upon your provision of certification by an appropriate healthcare professional.

Attached are the following documents that require your attention before your request for leave of absence can be processed:

_Notice of Eligibility and Rights and Responsibilities_ - This informs you of your right to Family and Medical Leave and explains the terms and conditions of the leave.

_Notice to Associate – Obligations under FMLA_ - This further explains the terms and conditions of the leave and specific expectations of RelaDyne LLC while on FMLA. Please read this information carefully prior to returning the Certification of Health Care Provider.

_Certification of Health Care Provider_- A Physician or Practitioner must complete the Certification of Health Care Provider form before the leave can be approved.

Please review the forms and return the completed <u>Certification of Health Care Provider</u> form to Walt Rodgers in Human Resources <u>within 15 days of receipt</u>. Failure to accomplish this may result in FMLA leave periods being disallowed. In that case, your absence could result in disciplinary action, up to and including termination. Upon receipt of the <u>Certification of Health Care Provider</u>, we will follow up with you on the approval/disapproval of your leave.

If you fail to return the Certification of Health Care Provider form or it is in any way incomplete, the FMLA designation may be withdrawn.

As of the date of this letter, all absence periods relating to this condition during what would be your normal work periods, will be tracked and counted against your annual FMLA leave entitlement. You will be required to furnish periodic reports on your status, and recertification of the serious / continuing health condition and its restrictions upon your ability to work a normal schedule of hours. Failure to furnish this documentation may also result in loss of approved FMLA status and could also result in absence-related discipline. We will do our best to accommodate your need for time off while we work to balance business needs with your personal needs. Please assist us by keeping us informed of your status and intent to return to work.

Please feel free to contact me at (513) 489-6000 if you have any questions.

Sincerely,

*Walt Rodgers /cc*

Walt Rodgers
V.P. Human Resources

50 E. Business Way Suite #420  •  Sharonville, OH 45241
513.489.6000  •  Fax: 513.489.0401  •  www.RelaDyne.com



PLAINTIFF'S
EXHIBIT

|

**Notice of Eligibility and Rights & Responsibilities (Family and Medical Leave Act)**



OMB Control Number 1215-0181
Expires: ░░░░░░

In general, to be eligible an associate must have worked for an employer for at least 12 months, have worked at least 1,250 hours in the 12 months preceding the leave, and work at a site with at least 50 associates within 75 miles.

**Part A – NOTICE OF ELIGIBILITY**

TO:
    Associate

FROM:   CHRIS CHAILLE
          Associate Representative

DATE:   JANUARY 29, 2014

On    JANUARY 28, 2014   , you informed us that you needed leave beginning on (to be determined) for:

_____ The birth of a child, or placement of a child with you for adoption or foster care;

__X__ Your own serious health condition;

_____ Because you are needed to care for your _____ spouse; _____ child; ___parent due to his/her serious health condition.

_____ Because of a qualifying exigency arising out of the fact that your _____ spouse; _____ son or daughter; _____ parent is on active duty or call to active duty status in support of a contingency operation as a member of the National Guard or Reserves.

_____ Because you are the _____ spouse; _____ son or daughter; _____ parent; _____ next of kin of a covered service member with a serious injury or illness.

This Notice is to inform you that you:

__X__ Are eligible for FMLA leave (See Part B below for Rights and Responsibilities)

_____ Are not eligible for FMLA leave, because (only one reason need be checked, although you may not be eligible for other reasons):

        _____ You have not met the FMLA's 12-month length of service requirement. As of the first date of requested leave, you will have worked approximately _____ months towards this requirement.
        _____ You have not met the FMLA's 1,250-hours-worked requirement.
        _____ You do not work and/or report to a site with 50 or more associates within 75 miles.

If you have any questions, contact Walt Rodgers or view the FMLA policy located in our associate manual (on our Intranet site).

**PART B-RIGHTS AND RESPONSIBILITIES FOR TAKING FMLA LEAVE**

As explained in Part A, you meet the eligibility requirements for taking FMLA leave and still have FMLA leave available in the applicable 12-month period. However, in order for us to determine whether your absence qualifies as FMLA leave, you must return the following information to us by FEBRUARY 12, 2014 (If a certification is requested, employers must allow at least 15 calendar days from receipt of this notice; additional time may be required in some circumstances.) If sufficient information is not provided in a timely manner, your leave may be denied.

____ Sufficient certification to support your request for FMLA leave. A certification form that sets forth the information necessary to support your request _X_ is/ _____ is not enclosed.

____ Sufficient documentation to establish the required relationship between you and your family member.

____ Other information needed: _____
                        _____
                        _____

    No additional information requested

CONTINUED ON NEXT PAGE            Form WH-381 Revised January 2009

If your leave does qualify as FMLA leave, you will have the following responsibilities while on FMLA leave (only checked blanks apply):

———— Contact Walt Rodgers at (513) 489-6000 to make arrangements to continue to make your share of the premium payments on your health insurance to maintain health benefits while you are on leave. You have a minimum 30-day (or, indicate longer period, if applicable) grace period in which to make premium payments. If payment is not made timely, your group health insurance may be cancelled, provided we notify you in writing at least 15 days before the date that your health coverage will lapse, or, at our option, we may pay your share of the premiums during FMLA leave, and recover these payments from you upon your return to work. ** Please note, normal deductions will come out of your paycheck if your leave qualifies for extended sick leave or other paid leave.

———— You will be required to use your available paid __X__ PTO and/or __X__ other leave during your FMLA absence. This means that you will receive your paid leave and the leave will also be considered protected FMLA leave and counted against your FMLA leave entitlement. **Please refer to paid leave polices in the associate manual.

———— Due to your status within the company, you are considered a "key associate" as defined in the FMLA. As a "key associate," restoration to employment may be denied following FMLA leave on the grounds that such restoration will cause substantial and grievous economic injury to us. We _____ have/ _XX_ have not determined that restoring you to employment at the conclusion of FMLA leave will

cause substantial and grievous economic harm to us.

_XX_ While on leave you will be required to furnish us with periodic reports of your status and intent to return to work every___ 4 WKS ___. (Indicate interval of periodic reports, as appropriate for the particular leave situation).

If the circumstances of your leave change, and you are able to return to work earlier than the date indicated on the reverse side of this form, you will be required to notify us at least two workdays prior to the date you intend to report for work.

If your leave does qualify as FMLA leave you will have the following rights while on FMLA leave:

- You have a right under the FMLA for up to 12 weeks of unpaid leave in a 12-month period calculated as:

———— the calendar year (January - December).

———— a fixed leave year based on _____

_XX_ the 12-month period measured forward from the date of your first FMLA leave usage.

———— a "rolling" 12-month period measured backward from the date of any FMLA leave usage. (See FMLA Policy)

- You have a right under the FMLA for up to 26 weeks of unpaid leave in a single 12-month period to care for a covered service member with a serious injury or illness. This single 12-month period commenced on DATE UNKNOWN AT THIS TIME.
- Your health benefits must be maintained during any period of unpaid leave under the same conditions as if you continued to work.
- You must be reinstated to the same or an equivalent job with the same pay, benefits, and terms and conditions of employment on your return from FMLA-protected leave. (If your leave extends beyond the end of your FMLA entitlement, you do not have return rights under FMLA.)
- If you do not return to work following FMLA leave for a reason other than: 1) the continuation, recurrence, or onset of a serious health condition which would entitle you to FMLA leave; 2) the continuation, recurrence, or onset of a covered service member's serious injury or illness which would entitle you to FMLA leave; or 3) other circumstances beyond your control, you may be required to reimburse us for our share of health insurance premiums paid on your behalf during your FMLA leave.
- If we have not informed you above that you must use accrued paid leave while taking your unpaid FMLA leave entitlement, you have the right to have _X_ sick, _X_ vacation, and/or ___ other leave run concurrently with your unpaid leave entitlement, provided you meet any applicable requirements of the leave policy. Applicable conditions related to the substitution of paid leave are referenced or set forth below. If you do not meet the requirements for taking paid leave, you remain entitled to take unpaid FMLA leave.

Once we obtain the information from you as specified above, we will inform you, within 5 business days, whether your leave will be designated as FMLA leave and count towards your FMLA leave entitlement. If you have any questions, please do not hesitate to contact: Walt Rodgers (513) 489-6000

PAPERWORK REDUCTION ACT NOTICE AND PUBLIC BURDEN STATEMENT
It is mandatory for employers to provide associates with notice of their eligibility for FMLA protection and their rights and responsibilities. 29 U.S.C. Sec. 2617; 29 C.F.R. Sec. 825.300(b), (c). It is mandatory for employers to retain a copy of this disclosure in their records for three years. 29 U.S.C. Sec. 2616; 29 C.F.R. Sec. 825.500. Persons are not required to respond to this collection of information unless it displays a currently valid OMB control number. The Department of Labor estimates that it will take an average of 10 minutes for respondents to complete this collection of information, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. If you have any comments regarding this burden estimate or any other aspect of this collection information, including suggestions for reducing this burden, send them to the Administrator, Wage and Hour Division, U.S. Department of Labor, Room S-3502, 200 Constitution Ave., NW, Washington, DC 20210. DO NOT SEND THE COMPLETED FORM TO THE WAGE AND HOUR DIVISION.

 Form WH-381 Revised January 2009



RelaDyne
Reliability in Motion

## FAMILY AND MEDICAL LEAVE ACT
### NOTIFICATION OF COMPANY PROCEDURES AND ASSOCIATE OBLIGATIONS

RelaDyne LLC recognizes that there will be occasions where associates need to take a leave for reasons covered by the Family and Medical Leave Act of 1993 (FMLA). Eligible associates may take such leave subject to the following conditions and procedures:

1. Eligible associates may take up to a maximum of 12 workweeks of FMLA leave in a "rolling" twelve (12) month period. FMLA leave generally is unpaid. Any FMLA leave taken will reduce an associate's remaining available leave entitlement.

2. Whenever foreseeable, an associate must apply for leave, and provide at least 30 days' advance notice before taking an FMLA leave. Failure to give the required notice may result in denial of leave until 30 days after appropriate notice is given.

3. Medical certification will be required whenever an associate is requesting an FMLA leave because of the associate's, or a spouse, parent, or child's, serious health condition. Medical certification must be completed by a health care provider using a DOL Form WH-380-E, available in the Human Resources Department. Certification should be provided to the Human Resources Department prior to an associate's leave, and must be provided no later than 15 days after an FMLA leave request has been acknowledged. Failure to provide the required certification may result in denial of leave. At its expense, the Company may require a second (and possibly third) health care provider's opinion certifying the existence of a serious health condition. Recertification may be required at 30-day intervals, or more frequently in the event of a change of circumstances.

4. Associates on FMLA leave will be required to periodically report on their status and intent to return from leave.

5. Intermittent or reduced schedule FMLA leave will be permitted only where medically necessary. RelaDyne LLC may temporarily alter the position of an associate on such leave, or may require an associate on such leave to transfer temporarily to an alternative position, in order to better accommodate an associate's need for such leave.

6. While on FMLA leave, associates may not engage in other employment or work of any kind.

7. Paid Time Off (PTO) and any other paid leaves will be applied toward any FMLA-qualified leave and will run concurrently.  After exhaustion of such paid leave, remaining FMLA will be unpaid.



**RelaDyne**

*Reliability in Motion*

8. While on FMLA leave, associates will be required to continue paying their portion of health insurance premiums. If the FMLA leave is covered by paid leave, premiums will be deducted as usual. If the FMLA leave is unpaid, the associate must remit payment at same time due via payroll deduction. If the associate fails to make the required payments, the health insurance may be cancelled and the associate will remain responsible for the amount of the associate's share paid by RelaDyne LLC. The Company will take action to recover such monies.

9. Before being restored to employment, any associate who has taken an FMLA leave that was in any part attributable to the associate's serious health condition must submit to the Company a medical certification that the associate is fit for duty.

10. If an associate fails to return from an unpaid FMLA leave for reasons other than a serious health condition or circumstances beyond the associate's control, the associate is indebted to the Company for the amount of premiums paid by to continue the associate's health (and any other) insurance coverage during the leave. RelaDyne LLC may take legal action against the associate to recover such monies. If the associate is unable to return from FMLA leave because of a serious health condition, medical certification substantiating the condition will be required.

11. You have a right to be restored to your original position or equivalent job with RelaDyne LLC provided you return to work on or before the end of your (12 week) FMLA leave period. If you are unable to return to work on or before the end of your (12 week) FMLA leave period, the Company will endeavor to return you to work; however, no guarantee of employment or requirement on the Company's part exist following expiration of the (12 week) period.

12. Deductions for any hours of unpaid intermittent or reduced schedule FMLA leave may be made from the salaries of exempt or nonexempt associates.

13. Additional requirements regarding FMLA leave may apply to salaried associates among the top paid ten percent of Company associates (considered "key associates"). If you are such an associate, you will be informed by the Human Resources Department at the time that you request a leave of the potential consequences of taking FMLA leave.

14. Disciplinary action may be taken against associates who violate any of their obligations contained in this Notification or in the FMLA.

15. RelaDyne LLC may amend this Notification unilaterally at any time following notice to our associates.



**RelaDyne**
Certification of Health Care Providers for
Associate's Serious Health Condition
(Family and Medical Leave Act)

**SECTION I: For Completion by the EMPLOYER**
**INSTRUCTIONS to the EMPLOYER:** The Family and Medical Leave Act (FMLA) provided that an employer may require an associate seeking FMLA protections because of a need for leave due to a serious health condition to submit a medical certification issued by the associate's health care provider. Please complete Section I before giving this form to your associate.

Employer Name and Contact: RELADYNE-CINCINNATI, CHRIS CHAILLE, DIV. HR COORDINATOR

Associate's job title: TERRITORY SALES REP     Regular work schedule: 40 HOURS

Associate's essential job functions: _____

SALES _____

Check if job description is attached: ☐

**SECTION II: For Completion by the ASSOCIATE**
**INSTRUCTIONS to the ASSOCIATE:** Please complete Section II before giving this form to your medical provider. The FMLA permits an employer to require that you submit a timely, complete, and sufficient medical certification to support a request for FMLA leave due to your own serious health condition. If requested by your employer, your response is required to obtain or retain the benefit of FMLA protections. 29 U.S.C. § 2613, 2614 ©(3). Failure to provide a complete and sufficient medical certification may result in a denial of your FMLA request. 20 C.F.R. § 825.313. Your employer must give you at least 15 calendar days to return this form. 29 C.F.R. § 825.305(b).

Your name: _____
     First              Middle           Last
If leave request is to care for a family member:
*   Patient's name: _____
*   Your relationship to the patient: _____
*   State the care you will provide and an estimate of the period during which care will be provided. Including a

schedule if leave is to be taken intermittently or if it will be necessary for you to work less than a full-time schedule:

_____
_____
_____
_____
_____

_____         _____
Associate Signature                         Date

**SECTION III: For Completion by the HEALTH CARE PROVIDER**
**INSTRUCTIONS to the HEALTH CARE PROVIDER:** Your patient has requested leave under the FMLA. Answer, fully and completely, all applicable parts. Several questions seek a response as to the frequency or duration of a condition, treatment, etc. Your answer should be your best estimate based upon your medical knowledge, experience, and examination of the patient. Be as specific as you can; terms such as "lifetime," "unknown," or "indeterminate" may not be sufficient to determine FMLA coverage. Limit your responses to the condition for which the associate is seeking leave. Please be sure to sign the form on the last page.

Provider's name and business address: _____

Type of practice/Medical specialty: _____

Telephone: _____  FAX: _____
     (area code) number                        (area code) number

**PART A: MEDICAL FACTS**
Patient's Name: _____

1. Approximate date condition commenced: _____

    Probable duration of condition: _____

    **Mark below as applicable:**
    Was the patient admitted for an overnight stay in a hospital, hospice, or residential medical care facility?
    ☐ No ☐ Yes. If so, dates of admission:

    _____
    _____

    Date(s) you treated the patient for condition:

    _____
    _____

    Will the patient need to have treatment visits at least twice per year due to the condition? ☐ No ☐ Yes.

    Was medication, other than over-the-counter medication, prescribed? ☐ No ☐ Yes.

    Was the patient referred to other health care provider(s) for evaluation or treatment (e.g., physical therapist)?

    ☐ No ☐ Yes. If so, state the nature of such treatments and expected duration of treatment:

    _____

2. Is the medical condition pregnancy? ☐ No ☐ Yes. If so, expected delivery date: _____

3. Use the information provided by the employer in Section I to answer this question. If the employer fails to provide a list of the associate's essential functions or a job description, answer these questions based upon the associate's own description of his/her job functions.

    Is the associate unable to perform any of his/her job functions due to the condition? ☐ No ☐ Yes.

    If so, identify the job functions the associate is unable to perform:

    _____
    _____

2          CONTINUED ON NEXT PAGE    Form WH-380-E Revised January 2009

4. Describe other relevant medical facts, if any, related to the condition for which the associate /patient seeks leave (such medical facts may include symptoms, diagnosis, or any regimen of continuing treatment such as the use of specialized equipment):

_____

_____

_____

_____

_____

_____

_____

**PART B: AMOUNT OF LEAVE NEEDED**

5. Will the associate/patient be incapacitated for a single continuous period of time due to his/her medical condition, including any time for treatment and recovery? ☐ No ☐ Yes

If so, estimate the beginning and ending dates for the period of incapacity: _____

6. Will the associate/patient need to attend follow-up treatment appointments or work part-time or on a reduced schedule because of the associate's medical condition? ☐ No ☐ Yes.
If so, are the treatments or the reduced number of hours of work medically necessary? ☐ No ☐ Yes.
Estimate treatment schedule, if any, including the dates of any scheduled appointments and the time required for each appointment, including any recovery period:

_____

Estimate the part-time or reduced work schedule the associate needs, if any:

_____ hour(s) per day; _____ days per week from _____ through _____

7. Will the condition cause episodic flare-ups periodically preventing the associate from performing his/her job functions? ☐ No ☐ Yes.

Is it medically necessary for the associate to be absent from work during the flare-ups? ☐ No ☐ Yes. If so, explain:

_____

_____

3                      CONTINUED ON NEXT PAGE      Form WH-380-E Revised January 2009

Based upon the patient's medical history and your knowledge of the medical condition, estimate the frequency of flare-ups and the duration of related incapacity that the patient may have over the next 6 months (e.g., 1 episode every 3 months lasting 1-2 days):

Frequency: _____ times per _____ week(s) _____ month(s)

Duration: _____ hours or _____ day(s) per episode

ADDITIONAL INFORMATION: IDENTIFY QUESTION NUMBER WITH YOUR ADDITIONAL ANSWER.

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

_____        _____
**Signature of Health Care Provider**        **Date**

From:                                    01/31/2014 12:18        #740 P.001/005



# FAX

| | |
|---|---|
| **To:** Walt Rogers | **From:** Ashley |
| **Fax:** 513-489-0401 | **Pages:** 5 |
| **Phone:** | **Date:** 1/31/2014 |
| **Re:** FMLA | **CC:** |

[ ] Urgent   [ ] For Review   [ ] Please Comment   [ ] Please Reply   [ ] Please Recycle

**Comments:** **Please call 561-214-9572 for questions**

**Confidentiality Statement**

This fax and any pages transmitted with it may contain PRIVILEGED or CONFIDENTIAL information and may be read or used only by the intended recipient. If you are not the intended recipient of the fax or any of its attachments, please be advised that you have received this fax in error and that any use, dissemination, distribution, forwarding, printing, or copying of this fax or any attached files is strictly prohibited. If you have received this fax in error, please immediately shred it and all attachments and notify the sender by reply fax or contact the sender at the number listed above.



PLAINTIFF'S
EXHIBIT
2

From:                                            01/31/2014 12:19      #740 P.002/005



### RelaDyne
### Certification of Health Care Providers for
### Associate's Serious Health Condition
### (Family and Medical Leave Act)

**SECTION I: For Completion by the EMPLOYER**
**INSTRUCTIONS to the EMPLOYER:** The Family and Medical Leave Act (FMLA) provided that an employer may require an associate seeking FMLA protections because of a need for leave due to a serious health condition to submit a medical certification issued by the associate's health care provider. Please complete Section I before giving this form to your associate.

Employer Name and Contact: RELADYNE-CINCINNATI, CHRIS CHAILLE, DIV. HR COORDINATOR

Associate's job title: TERRITORY SALES REP    Regular work schedule: 40 HOURS

Associate's essential job functions: _____
SALES

Check if job description is attached: ☐

**SECTION II: For Completion by the ASSOCIATE**
**INSTRUCTIONS to the ASSOCIATE:** Please complete Section II before giving this form to your medical provider. The FMLA permits an employer to require that you submit a timely, complete, and sufficient medical certification to support a request for FMLA leave due to your own serious health condition. If requested by your employer, your response is required to obtain or retain the benefit of FMLA protections. 29 U.S.C. § 2613, 2614 ©(3). Failure to provide a complete and sufficient medical certification may result in a denial of your FMLA request. 20 C.F.R. § 825.313. Your employer must give you at least 15 calendar days to return this form. 29 C.F.R. § 825.305(b).

Your name: Roger Paul Lankford
                First              Middle          Last
If leave request is to care for a family member:
•       Patient's name: _____
•       Your relationship to the patient: Self
•       State the care you will provide and an estimate of the period during which care will be provided. Including a
schedule if leave is to be taken intermittently or if it will be necessary for you to work less than a full-time schedule:

_____
_____
_____
_____
_____

_____                    01/30/2014
Associate Signature                            Date

1            CONTINUED ON NEXT PAGE    Form WFI-380-E Revised January 2009

From:                                    01/31/2014 12:20    #740 P.003/005

**SECTION III: For Completion by the HEALTH CARE PROVIDER**
**INSTRUCTIONS to the HEALTH CARE PROVIDER:** Your patient has requested leave under the FMLA. Answer, fully and completely, all applicable parts. Several questions seek a response as to the frequency or duration of a condition, treatment, etc. Your answer should be your best estimate based upon your medical knowledge, experience, and examination of the patient. Be as specific as you can; terms such as "lifetime," "unknown," or "indeterminate" may not be sufficient to determine FMLA coverage. Limit your responses to the condition for which the associate is seeking leave. Please be sure to sign the form on the last page.

Provider's name and business address: __Dr. Adam Bianchini MD__

Type of practice/Medical specialty: __Substance abuse__

Telephone: __561-214-9572__ FAX: __561-228-0680__
            (area code) number           (area code) number

**PART A: MEDICAL FACTS**
Patient's Name: __Roger Paul Lankford__

1. Approximate date condition commenced: __01/30/2014__

   Probable duration of condition: __approx 35 days__

   **Mark below as applicable:**
   Was the patient admitted for an overnight stay in a hospital, hospice, or residential medical care facility?
   [ ] No [✓] Yes. If so, dates of admission:
   __01/30/2014 - present__

   Date(s) you treated the patient for condition:
   __01/30/2014 - present__

   Will the patient need to have treatment visits at least twice per year due to the condition? [ ] No [ ] Yes. [✓] __unknown__
   Was medication, other than over-the-counter medication, prescribed? [ ] No [✓] Yes.

   Was the patient referred to other health care provider(s) for evaluation or treatment (e.g., physical therapist)?
   [✓] No [ ] Yes. If so, state the nature of such treatments and expected duration of treatment:

2. Is the medical condition pregnancy? [✓] No [ ] Yes. If so, expected delivery date: _____

3. Use the information provided by the employer in Section I to answer this question. If the employer fails to provide a list of the associate's essential functions or a job description, answer these questions based upon the associate's own description of his/her job functions.

   Is the associate unable to perform any of his/her job functions due to the condition? [ ] No [✓] Yes.

   If so, identify the job functions the associate is unable to perform:
   __Patient is unable to work while admitted inpatient.__

2          CONTINUED ON NEXT PAGE    Form WH-380-E Revised January 2009

From:                                    01/31/2014 12:20      #740 P.004/005

4.   Describe other relevant medical facts, if any, related to the condition for which the associate /patient seeks leave
     (such medical facts may include symptoms, diagnosis, or any regimen of continuing treatment such as the use of
     specialized equipment):

     *admitted for safe medical detox*
     *and inpatient substence abuse*
     *treatment.*

**PART B: AMOUNT OF LEAVE NEEDED**
5.   Will the associate/patient be incapacitated for a single continuous period of time due to his/her medical condition,
     including any time for treatment and recovery?  ☐ No  ☑ Yes

     If so, estimate the beginning and ending dates for the period of incapacity: *01/30/2014 – approx*
                                                                                  *3/06/2014*

6.   Will the associate/patient need to attend follow-up treatment appointments or work part-time or on a reduced
     schedule because of the associate's medical condition? ☑ No ☐ Yes.
     If so, are the treatments or the reduced number of hours of work medically necessary? ☐ No ☐ Yes.
     Estimate treatment schedule, if any, including the dates of any scheduled appointments and the time required for
     each appointment, including any recovery period:

     Estimate the part-time or reduced work schedule the associate needs, if any:

     _____ hour(s) per day; _____ days per week from _____ through _____

7.   Will the condition cause episodic flare-ups periodically preventing the associate from performing his/her job
     functions? ☐ No ☐ Yes.  *unknown*

     Is it medically necessary for the associate to be absent from work during the flare-ups? ☐ No ☐ Yes. If so, explain:

3                CONTINUED ON NEXT PAGE      Form WH-380-E Revised January 2009

From:                                                    01/31/2014 12:21     #740 P.005/005

Based upon the patient's medical history and your knowledge of the medical condition, estimate the frequency of flare-ups and the duration of related incapacity that the patient may have over the next 6 months (e.g., 1 episode every 3 months lasting 1-2 days):

   Frequency: ____ times per ____ week(s) ____ month(s)

   Duration: ____ hours or ____ day(s) per episode

   ADDITIONAL INFORMATION: IDENTIFY QUESTION NUMBER WITH YOUR ADDITIONAL ANSWER.

_____

Signature of Health Care Provider          1/30/2014

                                            Date

4                    CONTINUED ON NEXT PAGE     Form WH-380-E Revised January 2009

**Gregory Mansell**

| | |
|---|---|
| **From:** | Tony Downs |
| **Sent:** | Tuesday, February 04, 2014 9:08 AM |
| **To:** | David Luke; Tim Mastropaolo |
| **Subject:** | FW: Paul Lankford / Tire Man |

FYI

---

**From:** Dan Oehler
**Sent:** Tuesday, February 04, 2014 9:02 AM
**To:** Tony Downs; Douglas Oehler
**Cc:** Walt Rodgers
**Subject:** RE: Paul Lankford / Tire Man

Tony—He did NOT tell me. I found out yesterday from Bob Johnson. I'm in Houston and we will need to discuss this. We have too many signs to ignore and not proactively address.

Dan Oehler
VP of Sales and Marketing
RelaDyne, LLC
www.RelaDyne.com

9395 Kenwood Rd. Ste #104
Blue Ash, OH 45242

(o) 513.247.1443
(m) 513.476.4957

---

**From:** Tony Downs
**Sent:** Tuesday, February 04, 2014 8:57 AM
**To:** Dan Oehler; Douglas Oehler
**Subject:** FW: Paul Lankford / Tire Man

FYI – Paul L checked himself into rehab last Thursday in Florida for 35 days due to drinking – He told me he had notified the "Oehler's" so I take it he had talked to you two – He claims he told some of his customers he would be on medical leave and gave them contact names and numbers - - Donna is calling from the inside and I have Phil Marino handling his larger volume accounts – I did talk to Bob Kemper from Grismer Tire and he has been very unhappy with Paul for not calling on his Manager's at the stores (Phil to visit all stores) and wants Paul off his account – We will let him cool down and I will visit with Bob and get his account settled – Let me know if you have any other suggestions – Walt R has been notified as well - Thanks - TD

---

**From:** Bob Johnson
**Sent:** Monday, February 03, 2014 8:13 AM
**To:** Dan Oehler; Tony Downs
**Subject:** Paul Lankford / TireMan



Guys:

With Paul being out, I am happy to coordinate with Brian @ UCI for Friday's meeting. Wondering what I should communicate as to why Paul is out?

**Bob Johnson**
Automotive Channel Manager
317-696-3009



**Connect with RelaDyne:**

  

**Gregory Mansell**

| | |
|---|---|
| **From:** | Dan Oehler |
| **Sent:** | Tuesday, February 04, 2014 9:54 AM |
| **To:** | Walt Rodgers |
| **Subject:** | RE: Paul Lankford / Tire Man |

This is the 2nd.

Dan Oehler
VP of Sales and Marketing
RelaDyne, LLC
www.RelaDyne.com

9395 Kenwood Rd. Ste #104
Blue Ash, OH 45242

(o) 513.247.1443
(m) 513.476.4957

---

**From:** Walt Rodgers
**Sent:** Tuesday, February 04, 2014 9:53 AM
**To:** Dan Oehler
**Subject:** RE: Paul Lankford / Tire Man

Rehab twice?

---

**From:** Dan Oehler
**Sent:** Tuesday, February 04, 2014 9:41 AM
**To:** Walt Rodgers
**Subject:** RE: Paul Lankford / Tire Man

2nd time.

Dan Oehler
VP of Sales and Marketing
RelaDyne, LLC
www.RelaDyne.com

9395 Kenwood Rd. Ste #104
Blue Ash, OH 45242

(o) 513.247.1443
(m) 513.476.4957

---

**From:** Walt Rodgers
**Sent:** Tuesday, February 04, 2014 9:40 AM
**To:** Dan Oehler
**Subject:** RE: Paul Lankford / Tire Man

jesus



PLAINTIFF'S
EXHIBIT
4

1

**From:** Dan Oehler
**Sent:** Tuesday, February 04, 2014 9:03 AM
**To:** Tony Downs; Douglas Oehler
**Cc:** Walt Rodgers
**Subject:** RE: Paul Lankford / Tire Man

Also, I will be in the Toledo mtg Friday afternoon.

Dan Oehler
VP of Sales and Marketing
RelaDyne, LLC
www.RelaDyne.com

9395 Kenwood Rd. Ste #104
Blue Ash, OH 45242

(o) 513.247.1443
(m) 513.476.4957

**From:** Tony Downs
**Sent:** Tuesday, February 04, 2014 8:57 AM
**To:** Dan Oehler; Douglas Oehler
**Subject:** FW: Paul Lankford / Tire Man

FYI – Paul L checked himself into rehab last Thursday in Florida for 35 days due to drinking – He told me he had notified the "Oehler's" so I take it he had talked to you two – He claims he told some of his customers he would be on medical leave and gave them contact names and numbers - - Donna is calling from the inside and I have Phil Marino handling his larger volume accounts – I did talk to Bob Kemper from Grismer Tire and he has been very unhappy with Paul for not calling on his Manager's at the stores (Phil to visit all stores) and wants Paul off his account – We will let him cool down and I will visit with Bob and get his account settled – Let me know if you have any other suggestions – Walt R has been notified as well - Thanks - TD

**From:** Bob Johnson
**Sent:** Monday, February 03, 2014 8:13 AM
**To:** Dan Oehler; Tony Downs
**Subject:** Paul Lankford / TireMan

Guys:

With Paul being out, I am happy to coordinate with Brian @ UCI for Friday's meeting.  Wondering what I should communicate as to why Paul is out?

*Bob Johnson*
*Automotive Channel Manager*
*317-696-3009*



*Connect with RelaDyne:*



**Gregory Mansell**

| | |
|---|---|
| **From:** | Dan Oehler |
| **Sent:** | Wednesday, February 05, 2014 10:57 PM |
| **To:** | Walt Rodgers |
| **Cc:** | Tony Downs; Douglas Oehler |
| **Subject:** | FW: Paul Lankford report |
| **Attachments:** | Paul Lankford report.docx |

Walt: Tony may have sent this to you also, but I want to make sure that you have as well. I discussed with Tony today my thoughts, but we need to consult with you regarding his rehab condition. I'm happy to interject my opinions when desired. I have great loyalty of course to my past team, and I believe in Paul's capabilities. However, his lapses and ethics have both passed that loyalty.

Dan Oehler
VP of Sales and Marketing
RelaDyne, LLC
www.RelaDyne.com

9395 Kenwood Rd. Ste #104
Blue Ash, OH 45242

(o) 513.247.1443
(m) 513.476.4957

---

**From:** Tony Downs
**Sent:** Wednesday, February 05, 2014 11:17 AM
**To:** Dan Oehler
**Cc:** Douglas Oehler
**Subject:** FW: Paul Lankford report

FYI – Dave Luke to send more information – Thanks - TD

---

**From:** David Luke
**Sent:** Wednesday, February 05, 2014 11:11 AM
**To:** Tim Mastropaolo; Tony Downs
**Subject:** Paul Lankford report

Here is the report on Paul I combined both reports page 1 and page 2, I will scan all documents I have so we can send it to Dan and Walt-Dave



PLAINTIFF'S
EXHIBIT
5

Investigation into misappropriation of product

There has been an allegation against Paul Langford regarding misappropriation of product with the intent to defraud a customer.

According to the complainant lodged by the Manager (Dan) of Covington Auto Body located at 2111 Mote Dr. Covington, Ohio 45318, Paul Lankford approached him regarding a chartable event involving a local Charity. The arrangement was to be, Oil Distributing would donate oil and filters for six (6) oil changes, which were to be raffled off through this charity. Covington Auto body was to use the donated oil and filter and preform the oil changes in hopes of attracting new customers.

The first person to have their oil changed was Paul's mother, who stated to Dan the manager that Paul gave her the oil changes for Christmas as a gift.

The second customer who came into the shop for an oil change was Paul's sister-in-law.

Being suspicious of what might be going on, Dan contacted the charity and talked to someone he knew and asked if Paul Lankford, Oil Distributing Company or Reladyne was involved in type of donations? After checking the records, no evidence could be found relating to any donations made by Paul, ODC, or Reladyne.

Upon making his delivery of several cases of oil and one case of filters to Covington Auto Body our driver Bruce Gee asked the Manager Dan, how does he rate getting products for free? Dan started to explain how the deal was supposed to work. Dan stated Paul told him if Covington Auto body would do the changes as part of their donation and it would generate new business for him. Dan feels like he is losing money in labor and in topping off all the fluids during an oil change and he was duped into doing these oil changes

Upon hearing this allegation Bruce contacted his supervisor Mark Mielnicki who notified Tim Mastropaolo the Director of Operations. Once Tim had this information he contacted me to look into this matter on January 14, 2014.

Bruce Gee contacted me to inform me that the third oil change had occurred ant Covington Auto Body, the customer stated he was a buddy of Paul's and Paul gave to him as a Christmas gift.

The plan is to interview Dan of Covington Auto Body and to obtain the name of the charity and the contact person to review and obtain documentation on the charity.

(1)



On February 4, 2014 David Luke the Director of Loss Prevention, Safety & Compliance interviewed Mr. Dan Swartz the manager of Covington Auto Body located in Covington, Ohio. The interview was conducted to confirm information relayed to Bruce Gee a driver for Oil Distributing Company by Mr. Swartz alleging possible wrong doing by Paul Lankford.

Mr. Swartz was very cooperative and provided his firsthand account of what happened and he provided information to questions left unanswered.

- The raffle the products were supposed to have been donated to was in fact drawn in November 2013, and was for the Covington Football team.

- Paul approached Covington Auto Body in December and we delivered the product in January 2014 (three (3) cases of oil and one (1) of filters)

- When presented with the hand written card for an oil change, the holder of the card (Paul's mother) was informed by Mr. Swartz that they were too busy to accommodate it at the time.

- The customer (Paul's Mother) knew to go to Troy Express oil change in Troy Ohio.

- The next two customers went to Troy express oil change for their free oil change

  (Paul's sister-in-Law and a good friend)

- The oil changes were stopped by Steve Thompson the owner of the businesses, after a fourth oil change was attempted (unknown on who tried).

Based on all the facts obtained from this enquiry, I am of the opinion that Paul Lankford misrepresented himself to the Oil Distributing Company's Management team and Covington Auto Body for the purpose of procuring free oil changes for his family members and friends.

Thank you

Dave Luke

Director of Loss Prevention, Safety & Compliance
RelaDyne LLC.
Cell phone: 513-378-9715
Office: 513-467-3115
david.luke@reladyne.com

(2)

**Gregory Mansell**

| | |
|---|---|
| **From:** | Dan Oehler |
| **Sent:** | Wednesday, February 05, 2014 11:10 PM |
| **To:** | Walt Rodgers |
| **Subject:** | RE: Paul Lankford report |

Toledo got cancelled- see you Friday... Tony just needs help on an exit strategy.

Dan Oehler
VP of Sales and Marketing
RelaDyne, LLC
www.RelaDyne.com

9395 Kenwood Rd. Ste #104
Blue Ash, OH 45242

(o) 513.247.1443
(m) 513.476.4957

**From:** Walt Rodgers
**Sent:** Wednesday, February 05, 2014 11:09 PM
**To:** Dan Oehler
**Subject:** Re: Paul Lankford report

Awesome - safe travels!

On Feb 5, 2014, at 11:06 PM, "Dan Oehler" <Dan.Oehler@reladyne.com> wrote:

> Yep—got a nice plan B... in motion covering accounts – Cinto needed a few good things to happen.
> Great meeting in Houston today-—they are rocking.
>
> Dan Oehler
> VP of Sales and Marketing
> RelaDyne, LLC
> www.RelaDyne.com
>
> 9395 Kenwood Rd. Ste #104
> Blue Ash, OH 45242
>
> (o) 513.247.1443
> (m) 513.476.4957
>
> **From:** Walt Rodgers
> **Sent:** Wednesday, February 05, 2014 11:05 PM
> **To:** Dan Oehler
> **Subject:** Re: Paul Lankford report
>
> Wow
>
> On Feb 5, 2014, at 10:57 PM, "Dan Oehler" <Dan.Oehler@reladyne.com> wrote:



PENGAD 800-631-6989

**PLAINTIFF'S EXHIBIT**
6

1

Walt:  Tony may have sent this to you also, but I want to make sure that you have as well.  I discussed with Tony today my thoughts, but we need to consult with you regarding his rehab condition.  I'm happy to interject my opinions when desired.  I have great loyalty of course to my past team, and I believe in Paul's capabilities.  However, his lapses and ethics have both passed that loyalty.

Dan Oehler
VP of Sales and Marketing
RelaDyne, LLC
www.RelaDyne.com

9395 Kenwood Rd. Ste #104
Blue Ash, OH 45242

(o) 513.247.1443
(m) 513.476.4957

---

**From:** Tony Downs
**Sent:** Wednesday, February 05, 2014 11:17 AM
**To:** Dan Oehler
**Cc:** Douglas Oehler
**Subject:** FW: Paul Lankford report

FYI – Dave Luke to send more information – Thanks - TD

---

**From:** David Luke
**Sent:** Wednesday, February 05, 2014 11:11 AM
**To:** Tim Mastropaolo; Tony Downs
**Subject:** Paul Lankford report

Here is the report on Paul I combined both reports page 1 and page 2, I will scan all documents I have so we can send it to Dan and Walt-Dave

<Paul Lankford report.docx>