UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

ROGER PAUL LANKFORD,                          Case No. 1:14-cv-682

      Plaintiff,                              Judge Timothy S. Black

vs.

RELADYNE, LLC, *et al.*,

      Defendants.

## ORDER DENYING DEFENDANTS' MOTION
## FOR SUMMARY JUDGMENT (Doc. 19)

This civil action is before the Court on Defendants' motion for summary judgment

(Doc. 19), and the parties' responsive memoranda (Docs. 31, 42, 45).[1]

# I.     BACKGROUND

Plaintiff Roger Paul Lankford alleges that Defendants Reladyne, LLC and Four O

Corporation discriminated against him because of his disability in violation of the

Americans with Disabilities Act (ADA) and analogous state law, interfered with his

rights under the Family and Medical Leave Act (FMLA), and unlawfully retaliated

against him when they terminated his employment in February 2014.  Specifically,

Plaintiff alleges that he was terminated because he suffered from, and took FMLA leave

due to, alcohol dependency.

---

[1] The Court granted Defendants leave to file a supplemental reply because they did not have an opportunity to review Plaintiff's response to their proposed undisputed facts prior to filing their original reply.  (*See* October 1, 2015 Notation Order).

Defendants contend that Plaintiff was terminated because he misappropriated company product.  Plaintiff argues that statements made by Defendants' upper-level managers and the circumstances surrounding his termination demonstrate that Defendants' proffered reason is pretextual.

## II.    UNDISPUTED FACTS[2]

1.  Defendants Four O Corporation and Reladyne, LLC are in the business of providing motor oil and other supplies to auto dealers, auto repair shops, and other auto-related businesses.

2.  Plaintiff Roger Paul Lankford was employed as a territory sales representative for Four O Corporation d/b/a Oil Distributing Company, and later Reladyne, from 2008 until his termination on February 17, 2014.  (Doc. 27 at 14).[3]

3.  On January 14, 2014, Bruce Gee, a Reladyne delivery driver, made a delivery to Covington Body Shop in Covington, Ohio.  Included in that delivery were three cases of oil and twelve oil filters which were described as "no charge—per Paul."  "Paul" was a reference to Plaintiff, who was the sales representative for this account.  (Doc. 19 at 19, ¶¶ 1, 2).

4.  After delivering the free oil and filters, Gee asked Daniel Swartz, the manager of the Covington Body Shop, why he was so fortunate to get free oil and filters.  Swartz explained that they were for free oil changes that had been given away.  (Doc. 19 at 19, ¶ 3; Doc. 23 at 18–19).

5.  Subsequently, Gee asked his supervisor why products were being delivered free of charge.  (Doc. 19 at 19, ¶ 4; Doc 31-8 at 22–24).

6.  Gee's supervisor, Mark Mielenicki, elevated Gee's question to his supervisor, and ultimately to David Luke, Reladyne's Director of Loss Prevention.  (Doc. 21 at 15–18).

---

[2] *See* Docs. 19-1 and 43.

[3] The Court will refer to Defendants collectively as "Reladyne."

7. Gee was the regular route driver for deliveries to the Covington Body Shop. Swartz told Gee that Plaintiff's mother, Latricia Lankford, was the first person to return a coupon for a free oil change. (Doc. 19 at 19, ¶ 6; Doc. 23 at 18–19).[4]

8. The information obtained by Gee was provided to Luke, who spoke to Gee and arranged to speak to Swartz at the Covington Body Shop. (Doc. 19 at 19, ¶ 10; Doc. 21 at 20–24).

9. Luke is a retired lieutenant from the Hamilton County Sheriff's Office. He has more than thirty years of experience conducting investigations and interviewing witnesses. (Doc. 21 at 5, 89).

10. On February 4, 2014, Luke visited Swartz to interview him regarding the free materials and the circumstances of their donation. Luke obtained some written documentation from Swartz. (Doc. 21 at 25, Exs. 1–2; Doc. 23 at 23–24).

11. Swartz provided Luke with a copy of Latricia Lankford's service record from Express Tire and Auto Center, the Covington Body Shop's sister store in Troy, Ohio. (Doc. 21 Ex. 7; Doc. 23 at 20–21).

12. Swartz explained that when Latricia Lankford came to his location to redeem an oil change coupon, he was too busy to service her vehicle and she went to Express Tire and Auto Center. Both are owned by Steve Thomas, who Swartz described as a friend of Plaintiff. (Doc. 21 at 27–28; Doc. 23 at 24–25).

13. Prior to Latricia Lankford presenting the coupon for redemption, Swartz was unaware of the alleged promotion agreed to by Plaintiff and Thomas. (Doc. 23 at 14). The oil and filters had not yet been delivered. (*Id.* at 14–16).

14. Swartz also obtained from Express Tire and Auto Center, and provided to Luke, copies of two of the redeemed coupons, which consisted of handwriting on the back of Plaintiff's business cards. (Doc. 21 at 28–31; Doc. 23 at 25–26, Ex. A).

15. With this information in hand, Luke unsuccessfully attempted to contact the man identified by Swartz as the head of Covington Athletic Boosters. He also attempted to call Roger Craft at Covington High School but was unable to reach him. (Doc. 21 at 31–32; 34–35).

---

[4] Swartz testified that this conversation occurred in mid-January, when the free oil and filters were delivered. (Doc. 23 at 18–19; *see also* Doc. 31-7 at ¶¶ 7–8). Gee testified that this conversation took place when he made a subsequent delivery the following week. (Doc. 19 at 19, ¶ 6).

16. Upon returning to his office in Cincinnati, Luke prepared a report of his findings and presented it to Reladyne management, including Tony Downs (the general manager of Plaintiff's division), Walt Rodgers (Vice President of Human Resources), and Dan Oehler (Vice President of Sales and Marketing). (*Id.* at 37, 43–44, 49, Ex. 3).

17. On January 28, 2014, Plaintiff had informed Downs that he wanted FMLA leave to attend an alcohol rehabilitation program. Plaintiff submitted a leave request, which was approved on January 29, 2014. Plaintiff commenced his thirty-five day leave on January 30, 2014. (Doc. 27, Ex. B).

18. A number of e-mails were exchanged between and among member of Reladyne's management on February 5 and 6, 2014 regarding Plaintiff's termination. (Doc. 21 at 43–44, 49; Docs. 31-13 to 31-16; Doc. 31-19).

19. Because Plaintiff was on approved FMLA leave, it was determined that no action would be taken against him until he returned from his leave. (Doc. 21 at 12, 53–54).

20. In mid-February, Plaintiff texted Downs to let him know he had returned from leave. Downs texted Plaintiff to let him know he should attend a meeting at the Reladyne River Road location in Cincinnati on February 17, 2014. (Doc. 27 at 90–91, 100–101).

21. When Plaintiff arrived at the River Road location on February 17, 2014, he was met by Downs and Luke. (*Id.* at 90–91). Luke explained his findings. (Doc. 21 at 77–80; Doc. 27 at 90–92).

22. Plaintiff denied that the coupons were given to his mother and sister-in-law and claimed that he had no knowledge as to how they obtained them. (Doc. 27 at 31, 77–78; Doc. 21 at 80–82).

23. Plaintiff insisted that the coupons had been donated to Covington Boosters and that such donation had been approved by Downs. (Doc. 27 at 79).

24. Latricia Lankford testified that she obtained her oil change coupon at an auction for the Bucc Boosters at the Eagles Lodge in Covington in the fall of 2013. (Doc. 28 at 16–19).

25. There was no "Bucc Bash" in the fall of 2013, and no "Bucc Bash" was held at the Covington Eagles lodge at any time. The last two "Bucc Bashes" were held at the End Zone. (Doc. 22 at 17–18, 21–22).

26. Prior to April 2014, the last "Bucc Bash" had been in 2010. (*Id.* at 22).

27. Roger Craft, Covington High School's Athletic Director, maintains a record of all purchasers of auction items. (*Id.* at 12–13).

28. Craft has never seen cards like those allegedly donated by Plaintiff. (*Id.* at 17–18, Ex. D).

29. The Covington High School football team never received any oil change coupons donated by Plaintiff or Carl Lankford. (Doc. 19 at 22, ¶ 3).[5]

30. Cards like the ones redeemed by Plaintiff's mother and sister-in-law were never received by the football team. (*Id.* at 22, ¶ 4).

31. Plaintiff's sister-in-law, Jennifer Hounchell, received and redeemed one of Plaintiff's business card coupons, exactly as Luke had been told. (Doc. 25 at 14–15).

32. Hounchell had no specific recollection of when and where she received the coupon, but there is no doubt that it came into her possession. (*Id.* at 16, 18, 21–25, 29).

33. At the time Plaintiff obtained FMLA leave to attend an alcohol rehabilitation center, no one at Reladyne had suggested that he needed treatment. (Doc. 27 at 38).

34. Plaintiff had never been under the influence of alcohol at work. (*Id.* at 38–39).

35. Plaintiff has had no further treatment for alcoholism since his termination. (*Id.* at 46).

36. Plaintiff testified that he was not aware of anyone in Reladyne management who spoke critically of his decision to take FMLA leave. (*Id.* at 61–62).

---

[5] Carl Lankford testified that he gave an envelope, which he believed to contain oil change coupons, to the principal's receptionist. (Doc. 24 at 9–11). However, this does not establish that the football team received any such coupons.

37. Plaintiff testified that no one at Reladyne questioned his use of FMLA leave.  (*Id.* at 59).

38. Steve Thomas is the owner of the house in which Plaintiff resides.  Plaintiff is purchasing the house under a land contract.  (Doc. 37 at 9).

## III.    STANDARD OF REVIEW

A motion for summary judgment should be granted if the evidence submitted to the Court demonstrates that there is no genuine issue as to any material fact, and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).  The moving party has the burden of showing the absence of genuine disputes over facts which, under the substantive law governing the issue, might affect the outcome of the action.  *Celotex*, 477 U.S. at 323.  All facts and inferences must be construed in a light most favorable to the party opposing the motion.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

A party opposing a motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . .  must set forth specific facts showing that there is a genuine issue for trial."  *Anderson*, 477 U.S. at 248 (1986).

## IV.    ANALYSIS

Plaintiff's complaint sets forth six counts: (1) retaliation in violation of the FMLA; (2) disability discrimination in violation of Ohio Revised Code (O.R.C.) § 4112.02; (3) disability discrimination in violation of the ADA; (4) interference in violation of the FMLA; (5) retaliation in violation of O.R.C. § 4112.02; and (6) retaliation in violation of

the ADA. (*See* Doc. 7). Defendants move for summary judgment on each of these claims.[6]

Absent direct evidence, Plaintiff's claims are evaluated pursuant to the *McDonnell Douglas* burden-shifting framework.[7] First, Plaintiff must establish a *prima facie* case of discrimination or retaliation under the particular law. *See Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 572 (6th Cir. 2000). If Plaintiff succeeds, there is a presumption of discrimination or retaliation, and the burden shifts to Defendants to articulate a legitimate, nondiscriminatory reason for the employment action. *Id.* at 573. Plaintiff must then rebut this reason by showing that the proffered reason was pretext to hide Defendants' unlawful discrimination or retaliation. *Id.*

## A. FMLA Claims

"The FMLA entitles qualifying employees to up to twelve weeks of unpaid leave each year if, among other things, an employee has a 'serious health condition that makes the employee unable to perform the functions of the position of such employee.'" *Walton v. Ford Motor Co.,* 424 F.3d 481, 485 (6th Cir. 2005) (quoting 29 U.S.C. §2612(a)(1) (D)). An employee who utilizes FMLA leave is entitled to be restored to his position, or an equivalent one, when he returns from the leave. 29 U.S.C. § 2614(a)(1).

---

[6] The Court will consider Plaintiff's ADA and Ohio law claims together because those claims are analyzed under the same framework. *See Talley v. Family Dollar Stores of Ohio, Inc.*, 542 F.3d 1099, 1104 n. 3 (6th Cir. 2008).

[7] Because Plaintiff presents sufficient indirect evidence to defeat Defendants' motion for summary judgment, the Court need not address whether Plaintiff's arguments regarding direct evidence.

An employee may allege violations of the FMLA under the entitlement theory or retaliation theory.  *Edgar v. JAC Prods.*, *Inc.*, 443 F.3d 501, 507–08 (6th Cir. 2006).  The entitlement theory, also known as the interference theory, arises from the provision that it is "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided" by the FMLA.  29 U.S.C. § 2615(a)(1); *Edgar*, 443 F.3d at 507.  The retaliation theory, sometimes referred to as the discrimination theory, is premised on Section 2615(a)(2), which makes it "unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful" by the FMLA.  *Edgar*, 443 F.3d at 508.  "[A] single act may potentially constitute both interference and retaliation[.]"  *Wallner v. Hilliard*, 590 F. App'x 546, 551 (6th Cir. 2014).

## 1. Interference Theory (Count 4)

To establish a *prima facie* case of FMLA interference, an employee must prove that: (1) he was an eligible employee; (2) the defendant was an employer as defined under the FMLA; (3) he was entitled to leave under the FMLA; (4) he gave the employer notice of his intention to take leave; and (5) the employer denied him FMLA benefits to which he was entitled.  *Donald v. Sybra, Inc.*, 667 F.3d 757, 761 (6th Cir. 2012) (citations omitted).  In the context of an interference claim, there is no need for Plaintiff to show evidence of any particular employer motive or intent.  *Wallner v. Hilliard*, 590 F. App'x 546, 550 (6th Cir. 2014).

> Although an employer may defeat liability by showing that the FMLA
> benefit did not accrue to the plaintiff because the plaintiff was discharged
> for some other, legitimate reason, *see Donald v. Sybra, Inc.,* 667 F.3d 757,
> 762 (6th Cir. 2012); *Arban,* 345 F.3d at 401, the only things that a plaintiff
> must show to establish an FMLA interference claim are that she was
> entitled to benefits under the FMLA, notified her employer of her intent to
> exercise her FMLA rights, and was denied the FMLA benefits to which she
> was entitled. *See Edgar v. JAC Products, Inc.,* 443 F.3d 501, 507–08 (6th
> Cir. 2006).

*Id.*

Defendants argue that Plaintiff cannot fulfill the fifth element of the *prima facie*

case because he was not "entitled" to his position due to misconduct that was found to

exist during his absence.  In examining the fifth element, the Sixth Circuit has stated:

"[i]f an employer takes an employment action based, in whole or in part, on the fact that

the employee took FMLA-protected leave, the employer has denied the employee a

benefit to which he is entitled."  *Wysong v. Dow Chem. Co.*, 503 F.3d 441, 447 (6th Cir.

2007).   Accordingly, Plaintiff satisfies the burden as to the fifth element upon

demonstrating that "the employer has 'somehow used the leave against [him] and in an

unlawful manner, as provided in either the statute or regulations.'" *Id.* (citation omitted).

Viewing the facts in the light most favorable to Plaintiff, the Court finds that a

reasonable trier of fact could conclude that Defendants denied Plaintiff FMLA benefits to

which he was entitled.   Plaintiff requested FMLA leave on January 28, 2014 to obtain

inpatient treatment for his alcohol dependency.  (Doc. 27, Ex. B).  When he returned

from leave, he was not reinstated to his position or to an equivalent position, as required

by 29 U.S.C. § 2614(a)(1).

Further, Plaintiff sets forth evidence indicating that Defendants may have used his FMLA leave as a negative factor in their decision to terminate him, which is prohibited. *Wysong*, 503 F.3d at 447; *see also* 29 C.F.R. § 825.220(c) ("employers cannot use the taking of FMLA leave as a negative factor in employment actions"). On February 4, 2014, Tony Downs, the general manager of Plaintiff's division and Plaintiff's supervisor, e-mailed Doug and Dan Oehler to notify them that Plaintiff took medical leave for inpatient rehab for his alcohol dependency. (*See* Doc. 31-13). [8] Dan Oehler, Reladyne's Vice President of Sales and Marketing, responded, "[w]e have too many sig*ns* to ignore and not proactively address." (*Id.*) (emphasis added). Just six weeks prior, Downs had given Plaintiff a positive review, noting that he exceeded expectations in every category. (Doc. 19-3). Downs remarked that Plaintiff "is dependable and reliable." (*Id.* at 5).[9] Accordingly, based on the foregoing, Plaintiff set forth sufficient evidence to establish a *prima facie* case for his FMLA interference claim. [10]

---

[8] The Oehlers have an ownership interest in Reladyne. (Doc. 31-1 at 5, 7–8).

[9] In his e-mail to the Oehlers, Downs also mentioned that a customer was unhappy with Plaintiff for not calling on his store managers. (*See* Doc. 31-13). Oehler testified that his criticism of Plaintiff in this e-mail was directed to Plaintiff's work performance and complaints it had been generating. (Doc. 31-1 at 18–21). However, Defendants have  not cited any evidence showing that Plaintiff ever received a negative performance review or was subject to any disciplinary action, apart from the incident giving rise to his termination. Further, Oehler had not yet seen David Luke's report finding that Plaintiff had misappropriated of company product at the time he sent this e-mail. Therefore, a reasonable juror could find that "signs" referred, at least in part, to Plaintiff's FMLA leave, especially when considering the other statements set forth at Section IV.A.3, *infra*.

[10]  At his deposition, Plaintiff agreed that no one questioned or criticized his decision to take FMLA leave. (See Section II *supra*, Undisputed Facts Nos. 37, 38). However, this testimony relates to whether there is <u>direct evidence</u> of FMLA interference or retaliation. It does not preclude Plaintiff from carrying his burden via indirect evidence.

## 2.     Retaliation Theory (Count 1)

To establish a *prima facie* case of FMLA retaliation, an employee must show that: (1) he was engaged in an activity protected by the FMLA; (2) his employer knew that he was exercising his FMLA rights; (3) he suffered an adverse employment action; and (4) a causal connection existed between the protected activity and the adverse employment action.  *Seeger v. Cincinnati Bell Tel. Co.*, 681 F.3d 274, 283 (6th Cir. 2012).  "The burden of proof at the prima facie stage is minimal; all the plaintiff must do is put forth some credible evidence that enables the court to deduce that there is a causal connection between the retaliatory action and the protected activity."  *Dixon v. Gonzales*, 481 F.3d 324, 333 (6th Cir. 2007).

Defendants argue that Plaintiff cannot fulfill the fourth element of the *prima facie* case.[11]  The employer's motive is an integral part of the analysis in a retaliation claim.  *Edgar*, 443 F.3d at 508.  However, if "the adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation."  *Mickey v. Zeidler Tool and Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008). When some time elapses between these two events, "the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality."  *Id.*

---

[11] Defendants concede that Plaintiff can satisfy the first three prongs of the *prima facie* case. (*See* Doc. 19 at 11).

Here, the temporal proximity between Plaintiff's request for FMLA leave and his termination is significant.  Plaintiff requested FMLA leave on January 28, 2014.  (Doc. 27, Ex. B).  Reladyne's other upper-level managers did not become aware of the request for medical leave until February 4, 2014.  (*See* Doc. 31-13).  At the latest, they determined that Plaintiff should be terminated on February 6, 2014.  (*See* Doc. 21 at 12, 43–44, 49, 53–54; Doc. 31-19).

A reasonable juror could conclude that, because the decision to terminate Plaintiff was made almost immediately following his request for medical leave, there was a causal connection between his FMLA leave and his termination.  Further, Plaintiff has provided additional evidence of causation in the form of statements made by Reladyne managers regarding his termination.  (*See* Section IV.A.3, *infra*).  This evidence satisfies the minimal threshold required to establish a *prima facie* case of FMLA retaliation.

### 3.      Legitimate, Non–Discriminatory Reason and Pretext

Defendants have offered a legitimate, nondiscriminatory explanation for Plaintiff's termination—that Plaintiff misappropriated company product by providing free oil changes to family members.  (*See* Doc. 21 at 91; Doc. 27 at 91; Doc. 31-1 at 47–48; Doc. 33 at 28).  Accordingly, the burden shifts to Plaintiff to show that the proffered reason was pretext.

To establish pretext, Plaintiff must show that the proffered reason: (1) had no basis in fact; (2) did not actually motivate the adverse employment action; or (3) was insufficient to motivate that action.  *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994), *overruled on other grounds*, *Geiger v. Tower Automotive*,

579 F.3d 614 (6th Cir. 2009). The Sixth Circuit has retreated from formulaic application of these categories and stresses that they serve only as a tool to assist in the court in addressing the ultimate inquiry: "did the employer fire the employee for the stated reason or not?" *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 n. 4 (6th Cir. 2009).[12]

The Sixth Circuit has explained, with regard to the second method of establishing pretext:

> In such cases, the plaintiff attempts to indict the credibility of his employer's explanation by showing circumstances which tend to prove that an illegal motivation was more likely than that offered by the defendant. In other words, the plaintiff argues that the sheer weight of the circumstantial evidence of discrimination makes it "more likely than not" that the employer's explanation is a pretext, or coverup.

*Manzer*, 29 F.3d at 1084. "Unlike its role in establishing a *prima facie* case, 'the law in this circuit is clear that temporal proximity cannot be the sole basis for finding pretext.'" *Seeger*, 681 F.3d at 285 (quoting *Donald*, 667 F.3d at 763). However, the Sixth Circuit has found that "'suspicious timing is a strong indicator of pretext when accompanied by some other, independent evidence.'" *Id.* (citing *Bell v. Prefix, Inc.*, 321 Fed. App'x 423, 426 (6th Cir. 2009)).

As established above, the temporal proximity between Plaintiff's request for FMLA leave and his termination is significant—the decision to terminate Plaintiff was

---

[12] Defendants argue that Plaintiff is precluded from proving pretext by the second method because he denies that he misappropriated products. *See Chattman v. Toho Tenax Am., Inc.*, 686 F.3d 339, 349 (6th Cir. 2012) ("When an employee does not admit the factual basis underlying [the employer's] proffered legitimate reason for discipline, [this] eliminated the second category of pretext.") However, Defendants present no authority for the proposition that Plaintiff cannot argue multiple, alternative grounds for pretext, especially in light of the Sixth Circuit's guidance that the court should not "lose sight of the fact that at bottom the question is always whether the employer made up its stated reason to conceal intentional discrimination." *Chen*, 580 F.3d at 400 n. 4 (citation omitted).

made just days after upper-level managers received the news of Plaintiff's FMLA leave. *See* Section IV.A.3, *supra*.  Moreover, the following provide evidence that Defendants' proffered reason for Plaintiff's termination is pretext: (1) e-mails circulated between and among members of Reladyne's management prior to Plaintiff's termination; (2) statements made at Plaintiff's termination meeting; and (3) statements made following Plaintiff's termination.

Beginning on February 4, 2014, Reladyne managers exchanged a number of e-mails regarding Plaintiff.  These commenced when, as set forth above, Downs e-mailed Doug and Dan Oehler to notify them that Plaintiff took medical leave for inpatient rehab for his alcohol dependency and  Dan Oehler responded "[w]e have too many signs to ignore and not proactively address."  (Doc. 31-13).  Downs forwarded Dan Oehler's response to David Luke.  (*Id.*)  Defendants do not explain why information regarding Plaintiff's FMLA leave was sent to Luke, Reladyne's Director of Loss Prevention.  While Luke denies knowing about Plaintiff's leave at the time he commenced or completed his investigation into Plaintiff's alleged misappropriation of product, e-mail records indicate that he received the forwarded message the morning he interviewed Swartz (*i.e.,* the day <u>before</u> he circulated his report).  (*Compare* Doc. 21 at 11–12, 56, *with* Doc. 31-13).  A reasonable juror could conclude that Luke was tasked with proactively addressing Plaintiff's situation by providing a justification to fire him.

On February 5, 2014, Luke circulated his report, in which he concluded that Plaintiff made misrepresentations as a means to procure free oil changes for family

members and friends.  (*See* Docs. 31-10, 31-15).[13]  Doug Oehler responded to Luke's

report within minutes and stated:  "The last two reports from Paul are terrible and really

questions [sic] many things going on.  I would plan to make a change in this territory.

Reps need to be reliable and trusted, he has proven different in many cases."  (Doc. 31-

15).  Later that evening, Dan Oehler forwarded the e-mail with Luke's report to Walt

Rodgers, Director of Human Resources, and stated:

> Walt: Tony may have sent this to you also, but I want to make sure that you
> [sic] have as well.  I discussed with Tony today my thoughts, but we need
> to consult with you regarding his rehab condition.  I'm happy to interject
> my opinions when desired.  I have great loyalty of course to my past team,
> and I believe in Paul's capabilities.  However, his lapses and ethics have
> both passed that loyalty.

(Doc. 31-14).

      <u>In a follow-up e-mail to Rodgers, Dan Oehler indicated that they now had "a nice</u>

<u>Plan B."</u>  (*Id.*)  Dan Oehler's follow-up e-mail to Walt Rodgers undermines the

credibility of the Defendants' explanation.  A "Plan B" is an alternative strategy.  A

reasonable juror could believe that the original strategy, Plan A, was to terminate Plaintiff

because he was an alcoholic who needed medical leave to obtain treatment for his

condition.

---

[13] Because Plaintiff succeeds in presenting sufficient evidence from which a reasonable juror
could conclude that  Defendants were not motivated by Plaintiff's misappropriation of company
property and, instead,  were motivated by his need to take his medical leave to obtain treatment
for his condition, the Court need not evaluate Defendants' argument that they honestly believed
that Plaintiff had misappropriated product or Plaintiff's argument that Luke's report contains
significant inaccuracies and omissions—these arguments relate to the first method of
establishing pretext.  *See Joostberns v. United Parcel Servs., Inc.*, 166 F. App'x 783, 794 n. 5
(6th Cir. 2006).

At Plaintiff's termination meeting, which occurred once Plaintiff returned from leave a couple of weeks later, Downs filled out Plaintiff's termination sheet. (Doc. 31-16). Downs initially wrote "theft and dishonesty" and then wrote "misappropriation of product" on the termination sheet, but crossed off these reasons in an attempt to get Lankford to sign the document. (Doc. 27 at 91–93). Ultimately, in response to why the company would not re-employ Plaintiff, Downs stated, "Personal Life in Ruins—Needs Outside Help—Seemed 'High' in conference with David Luke and I." (*Id.*) The shifting justifications and the words ultimately chosen by Downs implicate Plaintiff's alcohol dependency as the reason for his termination.

Following Plaintiff's termination, Dan Oehler met with Steve Thomas, owner of the Covington Body Shop. (Doc. 31-6 at ¶15). According to Thomas, the two discussed Plaintiff's termination, and Dan Oehler admitted that while Defendants claimed that Plaintiff was terminated for the oil change issue, "[Thomas] know[s] as well as [Oehler] do[es] that this was not the only reason Paul was fired." (*Id.* at ¶16).[14] Similarly, Plaintiff testified that when he spoke with Dan Oehler about a week after he was terminated, and remarked "I know that's not why I got fired," Oehler responded "you can't bullshit bullshitters." (Doc. 27 at 97).

Taking all of the evidence in the light most favorable to Plaintiff, the Court finds that the written and oral statements made by Reladyne managers, and the timing of such, provide evidence from which a juror could reasonably infer that that Luke's investigation and report were part of a cover-up to make Plaintiff's termination appear legitimate. At

---

[14] Oehler claims that the other issue was a decline in Plaintiff's sales. (Doc. 31-1 at 48).

this stage, the relevant inquiry is whether Plaintiff has produced evidence from which a

jury could reasonably doubt the employer's stated explanation. *Chen v. Dow Chem. Co.*,

580 F.3d at 400. For the reasons set forth above, the Court finds that Plaintiff has

produced such evidence, as to his FMLA interference and retaliation claims.

Accordingly, Plaintiff has carried his burden as to pretext, and Defendants' motion for

summary judgment is denied as to Plaintiff's FMLA claims.[15]

## B. ADA and Ohio Law Claims

The ADA prohibits covered employers from discriminating against a "qualified

individual on the basis of disability" with regard to hiring, advancement, training,

termination, and "other terms, conditions, and privileges of employment." 42 U.S.C.

§ 12112(a). The ADA defines "discrimination" to include "not making reasonable

accommodations to the known physical or mental limitations of an otherwise qualified

individual with a disability." *Id.* at § 12112(b)(5)(A). Under the ADA, the plaintiff must

show that his disability was a "but for" cause of his termination. *Lewis v. Humboldt

Acquisition Corp., Inc.*, 681 F.3d 312, 315 (6th Cir. 2012) (*en banc*).

### 1. Disability Discrimination (Counts 2 and 3)

To make out a *prima facie* case of employment discrimination under Title I of the

ADA, a plaintiff must show that: (1) he is disabled; (2) he is otherwise qualified for the

position, with or without reasonable accommodation; (3) he suffered an adverse

---

[15] Plaintiff also suggests that he could satisfy the standard for mixed-motive analysis set forth in *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 400 (6th Cir. 2008). The Court need not decide whether that standard is applicable here, because Plaintiff has produced sufficient evidence to survive summary judgment under the more stringent *McDonnell Douglas* burden-shifting framework.

employment decision; (4) the employer knew or had reason to know of the his disability; and (5) the position remained open while the employer sought other applicants or the disabled individual was replaced. *Whitfield v. Tennessee*, 639 F.3d 253, 258–59 (6th Cir. 2011) (quoting *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1186 (6th Cir. 1996)).

Defendants argue that Plaintiff is unable to satisfy the first element of the *prima facie* case because there is no evidence that Plaintiff was disabled by his alcohol dependency. The ADA defines "disability" as "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1). The definition of a "disability" is to be construed broadly. *Id.* at § 12102(4)(A).

The EEOC regulations accompanying the ADA define "substantially limits" to mean either "[u]nable to perform a major life activity that the average person in the general population can perform" or "[s]ignificantly restricted as to the condition, manner, or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major activity." 29 C.F.R. § 1630.2(j)(1). "[M]ajor life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A). Alcoholism can constitute a disability under the ADA. *See Mararri v. WCI Steel, Inc.*, 130 F.3d 1180, 1185 (6th Cir. 1997).

18

Plaintiff testified that, at the time he obtained FMLA leave, no one at Reladyne had suggested that he needed treatment and that he had never been under the influence of alcohol at work.  (Doc. 27 at 38–39).  Plaintiff also testified that he has not had further treatment for alcoholism since his termination.  (*Id.* at 46).[16]  However, Plaintiff's medical records demonstrate that his alcohol dependency substantially limited his life activities.  Plaintiff's history of alcohol abuse caused him constant gastrointestinal issues, requiring him to have gastric bypass surgery at the age of 30.  (*See* Doc. 30-2 at 7).  In December 2011, Plaintiff was professionally diagnosed with alcohol dependency and admitted into The Watershed rehabilitative program.  (*See* Doc. 30-1).  As indicated in Plaintiff's discharge paperwork from The Watershed, Plaintiff's alcohol abuse would get to the point where he would drink in excess until he completely forgot what he did, or "blacked out."  (*Id.* at 28).  At that point in time, Plaintiff had developed a six-year history of alcohol dependence.  (*Id.*)

In January 2014, Plaintiff was re-diagnosed with alcohol dependency and admitted to The Treatment Center rehabilitative program.  (*See* Doc. 30-2).  Plaintiff's alcohol abuse had worsened to the point where he was consuming 30 to 40 beers per day.  (*Id.* at 4).  Plaintiff's alcohol dependency resulted in frequent intoxication and episodes of blacking out.  (*Id.* at 13).  Plaintiff admitted that he needed a drink by the early morning,

---

[16] Defendants attempt to rely on a number of other statements made by Plaintiff in his deposition. (*See* Doc. 19 at 9) (Proposed Undisputed Fact Nos. 48, 49, 51, 52).  However, these statements are contradicted by Plaintiff's medical records.  Further, at least as to the two latter statements, Plaintiff was speaking about his condition at the time of his deposition, not about his condition at the time he sought treatment.  The Court construes all facts and inferences in the light most favorable to Plaintiff and, therefore, considers whether Plaintiff's medical records establish that he had a disability.

and that his dependency has affected his ability to be a good father, friend, and has even affected his self-esteem. (*Id.*)  Plaintiff's addiction caused his life to revolve around drinking and prevented him from doing the normal daily activities that he would like to do.  (*Id.* at 14). Plaintiff admitted that his alcohol abuse had negatively impacted several domains of his life, including family problems, relationship problems, physical/health problems, and emotional problems.  (*Id.* at 16).  Thus, Plaintiff was significantly restricted as to the manner in which he could perform major life activities, including, at least, his ability to care for himself and to concentrate, as compared to the manner in which the average person could do so.  For the foregoing reasons, the Court finds that Plaintiff has established a *prima facie* case of disability discrimination.[17]

## 2.      Retaliation (Counts 5 and 6)

A *prima facie* case of ADA retaliation requires a showing that: (1) the plaintiff engaged in protected activity; (2) the employer knew of that activity; (3) the employer took an adverse employment action against the plaintiff; and (4) there was a causal connection between the protected activity and the adverse employment action.  *Rorrer v. City of Stow,* 743 F.3d 1025, 1046 (6th Cir. 2014).

---

[17] Defendants argue that Plaintiff's medical records contain inadmissible hearsay and have not been properly authenticated.  It appears that much of the material contained in the medical records would be admissible under Federal Rules of Evidence 803(4) (allowing for statements made for medical diagnosis or treatment) or 803(6) (allowing for records of regularly conducted activity).  To date, Plaintiff has not properly authenticated the medical records by providing testimony from a custodian or another qualified witness.  *See* Fed. R. Evid. 803(6)(D).  However, the Court has no reason to believe that these records could not be properly authenticated at trial. The Court prefers to decide disputes on their merits, not on technicalities.  Accordingly, the Court declines to strike the medical records from consideration.

Defendants argue that Plaintiff is unable to satisfy the first element of the *prima facie* case because there is no evidence that Plaintiff engaged in protected activity.  The Sixth Circuit has accepted that "the showing of a good-faith request for reasonable accommodations" is a "protected act" for purposes of an ADA retaliation claim.  *Baker v. Windsor Republic Doors,* 414 Fed. App'x 764, 776–77 & n. 8 (6th Cir. 2011).  In his deposition, Plaintiff denied ever asking for an accommodation, which was defined by counsel as a request that his job schedule be changed, his duties be changed, or that he be given any kind of assistance.  (*See* Doc. 27 at 48).  However, a medical leave of absence may constitute a reasonable accommodation, under appropriate circumstances.  *Cehrs v. Ne. Ohio Alzheimer's Research Ctr.*, 155 F.3d 775, 783 (6th Cir. 1998).  Here, Plaintiff requested medical leave to attend an alcohol rehabilitation program on January 28, 2014.  This request was approved, but Plaintiff was terminated immediately upon his return.  For these reasons, Plaintiff has established a *prima facie* case of ADA retaliation.

### 3.    Legitimate, Non–Discriminatory Reason and Pretext

The Court finds, largely for the same reasons as discussed above in the context of Plaintiff's FMLA claims, that there is sufficient evidence in the record to permit a reasonable juror to find that Defendants' proffered reason for its action—that Plaintiff misappropriated company product by providing free oil changes to family members—is pretext as to Plaintiff's ADA claims.  Specifically, the statements made by Reladyne managers, and the suspicious timing of Luke's report, support the conclusion that Luke's report was a cover up and that Defendants were motivated to terminate Plaintiff because

of his alcohol dependency.  Accordingly, Plaintiff has carried his burden as to pretext,

and Defendants' motion for summary judgment is denied as to Plaintiff's ADA claims.

## V.    CONCLUSION

Accordingly, for the foregoing reasons, Defendants' motion for summary

judgment (Doc. 19) is **DENIED**.

**IT IS SO ORDERED.**

Date:  11/19/15                                         *s/ Timothy S. Black*
                                                       Timothy S. Black
                                                       United States District Judge